### 12210

#### JOHNSON v. ATLANTIC COAST LINE R. CO. *ET AL.*

##### (140 S. E., 443)

1. MASTER AND SERVANT—VERDICT AGAINST MASTER ALONE, IN JOINT ACTION BASED ON SERVANT'S NEGLIGENCE OR WILLFUL TORT, CANNOT STAND.—Where master and servant are sued together for the same act of negligence or willful tort, and master's liability rests solely on servant's conduct, verdict against master alone is illogical and cannot stand.

2. MASTER AND SERVANT—MASTER AND SERVANT ARE BOTH LIABLE FOR SERVANT'S WILLFUL TORT.—Master as well as servant is liable in damages for willful tort of servant.

3. TRIAL—AWARDING GREATER PUNITIVE DAMAGES AGAINST RAILROAD THAN AGAINST SERVANT ON WHOSE WILLFUL CONDUCT ACTION WAS BASED DID NOT INVALIDATE VERDICT.—Awarding greater amount of punitive damages against railroad company than against agent on whose willful tort action was based *held* not to invalidate verdict, since punitive damages are determinable in part on pecuniary condition of defendants who are to be punished by award thereof.

4. COURTS—UNITED STATES SUPREME COURT DECISIONS, NOT BINDING ON STATE COURT, ARE NOT TO BE TAKEN AS PRECEDENTS.—Where decisions of the United States Supreme Court are not binding as authority on State Court, they are not to be taken as precedents, but to be regarded only as guiding influences.

5. DAMAGES—INJURED PARTY MAY RECOVER COMPENSATORY DAMAGES ONLY IN SUFFICIENT AMOUNT TO RECOMPENSE HIM FOR INJURIES.— Injured party should not receive, as compensatory damages, nor be

entitled to obtain, more than sufficient recompense for his injuries, in order to restore him to his former position.

6. DAMAGES—PUNITIVE DAMAGES ARE PROPERLY LEFT TO DISCRETION OF JURY, SUBJECT TO RIGHT OF TRIAL JUDGE TO APPROVE OR DISAPPROVE THEREOF.—In assessing punitive damages, character of tort and ability of wrongdoer to pay must be considered, and amount to be assessed is properly left to discretion of jury, subject to right of trial Judge to approve or disapprove.

7. MASTER AND SERVANT—MASTER IS LIABLE AS MATTER OF LAW FOR SERVANT'S NEGLIGENT AND WILLFUL ACT IN COURSE OF EMPLOYMENT. —Where servant is acting within scope of his employment, master's responsibility for negligent or willful acts of servant follow as matter of law.

8. MASTER AND SERVANT—PLAINTIFF IN ACTION FOR NEGLIGENCE OF SERVANT MUST STAND ON ALLEGATIONS OF NEGLIGENCE IN COMPLAINT. —Plaintiff in tort action must stand on allegations of negligence set out in his complaint, and, in absence of allegation of right to recover for negligence of servant, recovery cannot be had on any acts of negligence that are not chargeable to servant in manner alleged.

9. JUDGMENT—JUDGMENT AGAINST MASTER AND SERVANT FOR SERVANT'S ACT IS CONCLUSIVE AS TO MASTER'S LIABILITY, NEGLIGENT AND WILLFUL TORT, AND AMOUNT OF DAMAGES.—Judgment against master and servant for willful act of servant is conclusive as to master's liability to respondent in damages for injuries as resulting from servant's act within scope of employment, negligent and willful tort of servant, and amount of damages for payment of which master could be held responsible.

10. INDEMNITY—JUDGMENT AGAINST MASTER AND SERVANT FOR SERVANT'S ACT IS NOT CONCLUSIVE IN SUBSEQUENT INDEMNITY ACTION BY ONE DEFENDANT AGAINST OTHER.—Judgment against master and servant for servant's willful act is not conclusive in action for indemnity subsequently brought by one defendant against another, and amount of indemnity recoverable is limited to payment actually made in settlement of claim of injured person.

11. DAMAGES—MATERIAL FACTORS IN DETERMINING PUNITIVE DAMAGES ARE NATURE OF ACT, WILLFULNESS AND WANTONNESS, AND PECUNIARY CONDITIONS OF DEFENDANTS.—In determining the amount that should be assessed as punitive damages, material factors for consideration are nature of act complained of, circumstances of willfulness and wantonness attending act, and the pecuniary conditions of defendants who are to be punished.

12. TRIAL—SEPARATE VERDICT AS TO PUNITIVE DAMAGES MAY BE RENDERED AGAINST MASTER AND SERVANT FOR SERVANT'S WILLFUL ACT.—In action against master and servant based on willful act of servant,

separate verdict may be rendered in determining amount of punitive damages recoverable.

13. CORPORATIONS—CORPORATION'S LIABILITY FOR PUNITIVE DAMAGES DEPENDS ON PROPER ASCERTAINMENT OF ADEQUATE PENALTY FOR DISCIPLINARY EFFECT ON ITS POLICIES.—Corporation's liability for punitive damages for willful act of agent depends on proper ascertainment of adequate penalty to have disciplinary effect on policies of corporation as represented and carried out by acts of its agents.

14. TRIAL—JURY IN LAW ACTION MUST DECIDE FACTS AND RENDER VERDICT ON ISSUES.—Jury in action at law are charged with duty of deciding facts and rendering verdict on issues presented by pleadings.

15. APPEAL AND ERROR—SUPREME COURT, IN ABSENCE OF LEGAL ERROR, MAY NOT REVIEW JURY'S FINDINGS OR DISTURB VERDICT.—Supreme Court has no power to review findings of jury or to disturb their verdict, unless legal error is evident.

16. DAMAGES—IMPOSITION OF PUNITIVE DAMAGES IS PROPERLY MATTER FOR JURY.—It is particularly a matter for jury to decide what penalty or punitive damages will be calculated to serve as adequate corrective influence and how much damages should be imposed.

17. APPEAL AND ERROR—ADMITTING OR REJECTING TESTIMONY MUST BE LEFT TO TRIAL JUDGE'S DISCRETION.—Admission or rejection of testimony must be left very much to discretion of trial Judge.

18. TRIAL—TRIAL JUDGE DID NOT ABUSE DISCRETION IN REMARKING THAT IT WAS IMMATERIAL WHETHER WITNESS HAD RECOMMENDED ATTORNEY TO PLAINTIFF.—In action against railroad and its agent for willful act of agent, Judge's remark that he did not think testimony of witness denying that he had recommended attorney to plaintiff was material, *held* not an abuse of discretion, being a collateral matter.

19. APPEAL AND ERROR—IN ACTION AGAINST RAILROAD AND AGENT FOR AGENT'S ACT IN SEARCHING MERCHANDISE FOR LIQUOR, EXCLUDING EVIDENCE AS TO HAVING FOUND WHISKY ON PREMISES HELD NOT HARMFUL.—In action against railroad and agent for agent's willful act in searching plaintiff newsboy's merchandise for liquor, wherein agent had testified that he had at other times had occasion to locate whisky on railroad's property, sustaining objection to question as to whether it was usual thing for whisky to be found on company's premises *held* not harmful error.

Before RICE, J., Florence, November, 1924.   Affirmed.

Suit by E. P. Johnson against the Atlantic Coast Line Railroad Company, J. A. Dorsey, and another.   Judgment

for plaintiff against defendants named, and defendants named appeal.

The order of Judge Rice, directed to be reported, is as follows:

"This case was tried in the Court of Common Pleas for Florence County on November 14, 1924, resulting in a verdict in favor of plaintiff, and now comes before me on motion of the defendants, Atlantic Coast Line Railroad Company and J. A. Dorsey for a new trial; it having been agreed between counsel that the motion be marked 'Heard' at Florence, but argued before me at Marion.

"After hearing argument of counsel for defendants, and for plaintiff, the Court is of the opinion that the motion for a new trial should be refused, if plaintiff complies with the terms of this order hereinafter set forth, but that the verdict of the jury should be modified and reformed.

"The verdict in this case, for $200 actual damages and $300 punitive damages against the defendant Dorsey, and $500 actual damages and $1,500 punitive damages against the defendant Atlantic Coast Line Railroad Company, is of quite unusual character. The apportionment of damages against different defendants in an action for a joint trespass has, however, received the sanction of the Courts of this state in a number of early decisions. *Bevin v. Linguard,* 1 Brev., 503; 2 Am. Dec., 684. *Smith v. Singleton,* 2 Mc-Mul., 184; 39 Am. Dec., 122. *Boon v. Horn et al.,* 3 Strob, 159.

"Recognizing the principle of apportionment of damages, as above stated, there remains for consideration only its application to the facts of the present case. The jury has found both actual and punitive damages against the agent, as well as against the railroad. The finding that the agent of the railroad has committed a wrongful act of willful or wanton nature causing injury to the plaintiff, is sufficient to justify a verdict against the railroad company for actual and for punitive damages.

"There are two phases of the case which should be considered separately: The verdict as to actual damages, and the verdict as to punitive damages.

"The basis of recovery for actual damages against the railroad company is the act of Dorsey as captain of the railroad police. There is, according to the finding of the jury, no other liability against the railroad than that which arises through Dorsey's acts. While the finding by the verdict is the amount of $700, as the gross sum of actual damages sustained by the plaintiff, yet the sum of $200 only was found as the amount of actual damages caused by Dorsey. There is an apparent inconsistency in these two findings; and it would seem that the rule for the apportionment of damages according to the different degrees of guilt of the two defendants does not properly apply to this situation.

"Under such circumstances, it is my opinion that, as to actual damages, the verdict should be modified, and the plaintiff be permitted to have judgment in the sum of $200; this to be a judgment jointly against the defendant Dorsey and the defendant Atlantic Coast Line Railroad Company.

"The matter of punitive damages must be viewed from a different standpoint. Such damages are given as punishment; and it is a well-recognized rule that the punishment so imposed should be tempered according to the ability of the parties to pay.

"Thus in the case of *Webber v. Town of Jonesville,* 94 S. C., 197; 77 S. E., 859, it was remarked by Mr. Justice Hydrick:

" 'In estimating punitive damages, the jury have the right to consider the ability of the defendants to pay. And, while there was no testimony as to the wealth of any of the defendants, yet we know that juries consider such matters when they know the facts, even in the absence of testimony. * * * An amount which would be moderate punishment for the one might result in financial ruin to the other.'

"For the man of small means, the servant, the employee of the railroad company in a subordinate capacity, the amount of $300 as a fine or penalty might very properly be considered as punishment equally severe to a fine or penalty of $1,500 imposed upon a great railroad system of large resources and revenues.

"Applicable to the situation of these defendants, under the facts as they are known to the jury, is the rule that states in the case of *Nelson v. Halvorson et al.,* 117 Minn., 260; 135 N. W., 819; 1913-D, Ann. Cas., 106:

" 'The difference in financial condition of the two defendants would alone justify the jury in imposing different amounts as punishment upon them, in case the conclusion was reached that both ought to be penalized.'

"The amount of punitive damages that should be awarded by the plaintiff against either defendant is pre-eminently a matter for the determination of the jury.

"As to the cause of action for actual damages, I find, in accordance with the conclusions above stated, that a new trial should be granted, unless the plaintiff shall remit of the verdict for actual damages, by a notice in writing given the defendants' attorneys within 10 days from the date of this order, the amount of said verdict in excess of $200, and, in the event of such remission, the plaintiff shall be authorized to enter judgment in the sum of $200 jointly against the defendant Dorsey and the defendant Atlantic Coast Line Railroad Company.

"As to the cause of action for punitive damages, the plaintiff may enter judgment against the two defendants separately, in accordance with the findings made by the jury."

*Mr. F. L. Willcox,* for appellants, cites: *Error to permit verdict to stand against employer for larger amount than verdict allowed against employee, through whose act alone any damage could have been sustained by plaintiff:* 104 S. C., 266; 106 S. C., 20; 113 S. C., 522; 128 S. E., 741.

*Cases distinguished:* 124 S. E., 186; 111 S. C., 405; 114 S. C., 21; 117 S. C., 4; 125 S. E., 650.

*Messrs. R. E. Whiting* and *D. Gordon Baker,* for respondent, cite: *Answers to questions upon irrelevant matter to determine credibility of testimony, cannot be impeached or attacked by other witnesses offered in rebuttal:* 33 S. C., 582; 106 S. C., 11; 105 S. E., 631; 112 S. E., 78. *Appellant's contentions weakly supported by one case:* 130 S. C., 180. *Apportionment of damages against different defendants in action for joint trespass sanctioned:* 1 Brev., 503; 2 McM., 184; 3 Strob., 159; 1 Bay, 15; 111 S. C., 141; 130 S. C., 181. *Basis of punitive damages:* 2 Bay, 416; 3 Strob., 432; 9 Rich., 423; 11 Rich., 649; 14 Rich., 237; 16 S. C., 435; 21 S. C., 599; 34 S. C., 311; 60 S. C., 48; Id., 160; 6 S. C., 1, 42; 16 S. C., 575; 79 S. C., 502; 89 S. C., 287; 94 S. C., 189. *Liability of master for punitive damages for misconduct of servant:* 29 S. C., 381; 3 S. C., 580; 28 S. C., 261; 33 S. C., 436; 35 S. C., 493; 35 S. C., 475; 37 S. C., 194; Id., 377; 57 S. C., 228; 58 S. C., 143; 68 S. C., 89; 103 S. C., 467; 147 U. S., 101; 37 L. Ed., 97; 172 U. S., 534; 43 L. Ed., 543; Sutherland on Damages (4th Ed.), Vol. 2, Sec. 409; 84 S. C., 190, 192. *Liability of employee to employer:* 15 R. C. L., 1017; 18 R. C. L., 502; 21 R. C. L., 824; 15 R. C. L., 1013; 1014. *Dividing liability between two defendants had effect of relieving railroad company from part of damages assessed in plaintiff's favor that would have been imposed under a joint verdict:* 128 S. C., 59; 124 S. C., 458; 90 S. C., 183; 30 A. L. R., 782.

May 26, 1927.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

The plaintiff-respondent, a newsbutcher, employed by the Union News Company, brought suit against the defendants Atlantic Coast Line Railroad Company and Brown and Dor-

sey, two of the agents of the Railroad Company, engaged in its police department. Plaintiff alleged that Brown and Dorsey went into a car, where he had his containers of merchandise, and forced him to open these, charging plaintiff with having contraband liquor in his possession; that the officers had no warrant authorizing the search, but that it was done by threats that they would get a warrant of arrest if plaintiff did not submit, and that under this threat he allowed them to open and search through the containers; that the officers cursed and abused him, and detained him from his business and in their custody; that the torts alleged were willful and wanton.

The defendants admitted the search of plaintiff's containers, and that they had no warrant therefor, but alleged that the search was made with the consent of the plaintiff, and denied that any profane language was used, that any tort was committed, and that any damage occurred. It was admitted that no whisky was found in plaintiff's possession.

The cause was heard before his Honor, Circuit Judge H. F. Rice, and a jury. The verdict was in favor of the plaintiff, acquitted Brown, and was against the defendants J. A. Dorsey and Atlantic Coast Line Railroad Company, and was in the following language:

"We find for the plaintiff $1,500 punitive, $500 actual damage against the A. C. L. R. R. Co.; $300 punitive damage and $200 actual damage against J. A. Dorsey."

The defendants Atlantic Coast Line Railroad Company and Dorsey moved for a new trial. Judge Rice, in disposing of this motion, stated the questions raised before him, and discussed these in an able manner. His order will be reported in full.

The effect of Judge Rice's order was to grant a new trial, unless the plaintiff remitted of the verdict in his favor the sum of $300 of the actual damages found for him against the railroad company, thereby making the verdict only $200 actual damages against both defendants jointly, and $1,800

punitive damages, apportioned between the two defendants, with $1,500 thereof against the railroad company, and $300 against the defendant Dorsey.

The defendants Dorsey and Atlantic Coast Line Railroad Company have appealed to this Court from the result in the lower Court, and bring five exceptions for our consideration.

Three of the exceptions (3, 4, and 5), relate to the same matters, and will be considered together. The contention of these exceptions is that the verdict against the railroad company, the master, should not be permitted to stand in a greater amount than the verdict against Dorsey, the servant.

We have been greatly impressed by the strong arguments submitted by both the counsel for the appellants and the respondent. Counsel for the appellants, to sustain the position taken, cites the following cases decided by this Court: *Jenkins v. Railroad Co.,* 89 S. C., 408; 71 S. E., 1010. *Sparks v. A. C. L. Railroad Co.,* 104 S. C., 266; 88 S. E., 739. *Jones v. Southern Railway Co.,* 106 S .C., 20; 90 S. E., 183. *Beauchamp v. Winnsboro Granite Corporation,* 113 S. C., 522; 101 S. E., 856. *Durst v. Southern Railway Co.,* 130 S. C., 165; 125 S. E., 651. We shall not undertake now to review fully all these cases. Later in this opinion we shall refer to some of them in consideration of certain matters.

At this time, we think it only necessary to say that, in so far as those cases are applicable to the main proposition we have before us at this time for determination, this one important principle runs through all of them, to wit: *That, when the master and the servant are sued together for the same act of negligence or willful tort, and the master's liability rests solely upon the servant's conduct, a verdict against the master alone is illogical and cannot stand.* This seems to us to be a reasonable and proper rule, for it is an inconsistent declaration on the part of the Court to say that, while the servant is without blame in his conduct,

yet, because of that same conduct, the master is to be held blamable.

The facts in the case at bar and the verdict rendered do not, however, bring the cause within the line of the principles announced in any of the cases cited by the appellants and discussed by us. To the contrary, we think this case is readily distinguished from each of the cases mentioned. In the case here, one of the servants was not acquitted; the appealing defendants, sued together, for the same tort, the one as servant of the other as master, were both convicted of the wrongs charged against them. Since the servant, found guilty, was acting about the master's business, *and the jury found that the servant was guilty of the willful torts charged against him, it necessarily followed, by our cases, that the master as well as the servant was liable to the plaintiff in damages.* But the jury, by its verdict, said that the railroad company, the master, should pay more money as damages, both actual and punitive, than the amount required to be paid by Dorsey, the servant. The verdict assessed only $200 as actual damages against the servant and $500 as such damages against the master. As punitive damages, the master was required to pay $1,500, while the servant was only held liable for $300. Under the authority of *Rhame v. City of Sumter*, 113 S. C., 151; 101 S. E., 832, the plaintiff's verdict was for $700 as actual damages, and $1,800 as punitive damages. The order of Judge Rice on the motion for a new trial made the judgment, when the remission was made by the plaintiff, one for only $200 actual damages against both defendants, jointly, and $1,800 as punitive damages, apportioned between the two defendants, with $1,500 against the master and $300 against the servant.

The appellants insist that, even as reduced, reformed, and corrected, the verdict of the jury cannot stand under the cases cited by them, since the amount of damages to be paid by the railroad company is in excess of

the sum required of the agent. As stated, we do not think the authorities referred to support that proposition.

There is, however, one case which seems to support the contention of the appellants; namely, *Jenkins v. Southern Railway Co.,* 130 S. C., 180; 125 S. E., 912 (not the same *"Jenkins"* case cited above). The respondent has practically conceded that this case sustains the position of the appellants, and accordingly his attorneys have asked and obtained the leave of this Court to review and criticize it.

In *Jenkins v. Southern Railway Co.,* the suit was for malicious slander against the railway company and its station agent, Cooper. The verdict was in favor of the plaintiff for $2,000 against the railway company and $150 against the agent. It is not stated in the report if the damages found were actual or punitive, but we assume, from the nature of the action and from the reading of the report, that they were for punitive damages, and, certainly, that they included damages of that character. The judgment of the lower Court in the case was reversed, and the case was remanded for a new trial; *this Court holding that the railroad corporation could not be held liable in damages for a greater amount than that assessed against the agent.* If the holding there made is to stand, both as to actual and punitive damages, then it must follow that the judgment in this case cannot be affirmed. We refer to this case hereafter as the *Jenkins case.*

Coming from the pen and mind of that indefatigable worker and most learned jurist, Mr. Associate Justice Cothran, concurred in by the able Mr. Associate Justice Marion, and that lawyer of pre-eminence, Hon. E. Marion Rucker, who acted in the case as an Associate Justice, the opinion in the *Jenkins* case should be thoroughly digested and well considered before one should question the principles there announced. The writer of the opinion frankly conceded that prior thereto it had been repeatedly held in this state that, in some instances of joint trespasses, the jury could sever the damages and apportion them according to the degree and

nature of the offense committed by each defendant. He reviewed fairly and at length many of our decisions to show that this principle had been recognized and followed for many years. Emphasis was laid upon the fact that *many appellate tribunals of other jurisdictions, including the Supreme Court of the United States, had held otherwise.* Calling especial attention to the fact that the rule in South Carolina was a departure from the rule of the common law, which fact had been admitted theretofore by some of the Judges of this state, the language of the learned jurist clearly indicates his own opinion that the holding of this Court has been erroneous, and that the conclusion of the United States Supreme Court is correct. But this candid admission was made: "However much the departure from the rule of the common law may be regretted, it has been too firmly adhered to to be now abandoned."

With due respect to the learned jurists who decided the *Jenkins case,* we are of the opinion that, while the rule as laid down there should continue to be enforced as to compensatory damages, it should be modified so as not to apply to punitive damages. We feel encouraged to take this position, not only because we deem it to be the rule of right, but for other reasons. Among these is the one that so many of the Judges of this Court expressed themselves favorably to our view, or views leading to our conclusion, prior to the *Jenkins decision;* another, that the views of the learned late Chief Justice Gary, as expressed by him in many of his opinions, and in many opinions of other Judges with whom he concurred, give us assurance that, had he participated in the *Jenkins case,* the majority opinion there would have been the minority opinion of the Court. While he never passed directly on the point decided in that case, we are confident, from his expressions in other causes, that he would not have indorsed the majority opinion rendered. Then we have before us the clear and vigorous, if brief, dissent of Mr.

Justice Watts, concurred in by the later lamented Mr. Justice Fraser.

The reasons assigned by Judge Rice for his refusal to set aside the verdict for punitive damages are, really, entirely sufficient to support his order. Since his ruling is in conflict, however, with the decision in the *Jenkins case,* and for the reason that there has been a difference of opinion among the members of this Court heretofore as to the just rule which should be adhered to, concerning the matter at issue, and since most learned members of this Court still insist that the *Jenkins opinion* should not be overruled or modified, we deem it not out of place that we should state some grounds, occurring to us at this time, in addition to those mentioned by the learned Circuit Judge, and that we should refer to additional authorities, which make it clear to us that the action of the lower Court was correct.

This Court, of course, has great respect for the decisions of the Supreme Court of the United States, but, where those decisions are not binding as authority upon this Court, they are not to be taken as precedents, but are to be regarded only as guiding influences. *It may not be amiss either to remind ourselves occasionally, as well as others who may be interested, that frequently this Court has positively refused to follow not only the view of the Courts of other states, but those of the highest Court in the land as well.*

In the discussion of principles in causes involving the subjects of torts and exemplary damages, we should not overlook the important fact that, pertaining to these matters, the federal and South Carolina decisions are far apart. In tort actions, in the federal Courts, only one verdict and one damage is permissible against all defendants who are found to be guilty; while in our Courts, it has been held repeatedly that damages against joint tortfeasors may be apportioned. While the federal decisions have been to the effect that, before the master can be held liable for the willful tort of his

servant, there must be evidence that he had authorized or ratified the wrongful act; it has been frequently held in this state that the master is liable for the servant's willful tort, when the servant is acting within the scope of his authority and duties, although there may not have been a direct authorization or ratification. Again, in the federal Courts, it has been held, or certainly indicated that it would be held, that, when two or more persons are sued in the same action for the same tort, evidence as to the wealth of but one of the defendants is not admissible; while in this state such testimony is admitted to be competent. When the differences in the respective viewpoints of the two jurisdictions have been carefully studied, we think it can be readily understood why the Supreme Court of the United States holds it improper to permit apportionment of punitive damages between principal and agent in tort actions, and why this Court should declare to the contrary.

Compensatory damages relate mainly to the situation of the injured party, the plaintiff generally. But he should not receive, nor should he be entitled to obtain, thereby more than sufficient recompense for his injuries—just enough to restore him to his former position, a sum only to make him whole. He, and he alone, usually is particularly affected in that regard.

Exemplary damages have relation to the injured party in only one respect, to vindicate his right, recklessly, willfully, maliciously, or wantonly invaded. They relate more to the situation of the wrongdoers, the defendants, usually. One of the chief purposes in awarding damages of this class is to punish the wrongdoer, not only to prevent by him a recurrence of the wrongful act, but to deter others from conduct of the same or similar kind. They are not intended for the sole good of the injured party. And not for the improvement of the disposition and character alone of the willful tortfeasor is it that our law has looked with favor upon the assessment of punitive damages under certain cir-

cumstances. But the object is to protect every man, woman, and child from those who consciously disregard the rights of their fellows. It follows that the state, as the guardian and protector of the rights of her citizens, is therefore interested in the assessment of punitive damages, and that all the people may look to the law of their land to defend them from wrongful invasions of both their personal and property rights.

Another reason for holding that it is not logical to permit the apportionment of actual damages is due to the outstanding fact that in many instances such damages may be easily measured in dollars and cents; it being ordinarily a matter of calculation only to estimate the value of time, loss of money, physicians' bills, and many other items generally included in damages of that class. On the other hand, in the assessment of punitive damages, there is no exact monetary standard which can be used as a measure, and in assessment of such damages the main things to be considered are the character of the tort committed, the punishment which should be meted out therefor, and the ability of the wrongdoer to pay. *The amounts which should be assessed as punitive damages, therefore, are properly left to the discretion of the jury, subject to the right of the trial Judge to approve or disapprove,* as has been so often held by this Court.

The commonwealth, as well as the aggrieved party, has an interest in the matter of exemplary damages. This Court, as well as Courts inferior to this, have duties to perform to litigants and the people of the state. One of these duties, and one of very great importance, is to hasten the end to lawsuits. It was well said by Mr. Justice Cothran in *Sumter Trust Co. v. Holman,* 134 S. C., 412; 132 S. E., 811: "It is a proverb as old as the law that it is to the interest of the state that there be an end of litigation." While this interest of the state must be at all times subordinate to that greater object of dealing out justice, it is undoubtedly true that a

speedy end of litigation aids materially in bringing to our people a greater respect for our laws and the Courts. It must be acknowledged that frequent mistrials have a tendency to discourage those who believe in the greatness of jury trial and who desire an early conclusion to litigation. It it also a well-recognized condition that in our system of jury trial, where the verdict of twelve men must be unanimous, the defendant has a decided advantage in procuring a verdict in his favor or a mistrial in a cause. All of the twelve men on the panel must agree, not only that the plaintiff is entitled to recover, but they must be unanimous as to the amount he should receive, before the plaintiff can win his cause. If one juror insists that the defendant should have a verdict in his favor, or if he stands out for a sum unreasonably small in favor of the plaintiff, for either actual or punitive damages, he may force a verdict which meets his views and is to the interest of the defendant, or bring about a mistrial in the action. To require a jury to go further in a tort action, and to agree unanimously that two or more defendants, some rich and some poor, should be assessed an identical amount by way of exemplary damages, will only add to the already innumerable difficulties in securing verdicts in our Courts, and will postpone the conclusion of trials, without furthering justice.

There is another matter we think worthy of serious consideration, and which justifies our holding that the principal should sometimes he required to pay a larger sum as punitive damages than should be assessed against his agent. In some circumstances a tortfeasor cannot only be mulcted in damages on the civil side of the Court, but he may also be subjected to punishment in the Criminal Courts for a violation of the law of the State. In many tort actions instituted in our Courts the agent is an individual, while the principal is often a corporation. The individual who, in injuring willfully another, may have violated some criminal statute, may not only be forced to pay damages on the civil

side of the Court, but he might be required to suffer punishment other than the payment of a fine. The corporation, an artificial person, however, regardless of the tort inflicted by it, or the manner in which it may have been inflicted, even, in cases where a corporation may have directed the act, or may have subsequently ratified it, cannot be required to do more than pay out money. To follow the reasoning in the *Jenkins case* to its last analysis would amount to saying that some impecunious individual, agent of a wealthy corporation, for a willful tort committed by him, would not only have to pay the same amount of money damages as that required of his corporate employer, but, in addition thereto, the agent might have to suffer punishment more severe than the payment of money, while the corporation could escape with only pecuniary loss, and that in no greater amount than the sum assessed against its agent. Certainly, in instances where the law of the land has been purposely evaded or positively infringed by an artificial person, through one of its agents or servants (the only way in which a corporation may act), when this invisible person cannot be physically touched, such artificial creation should be required, in the only way in which the law is able to reach it, to be made to suffer punishment sufficient to meet the offense.

The controlling factor of decision in the majority opinion in the *Jenkins case,* 130 S. C., 180; 125 S. E., 912, was the consideration, in relation to the judgment, of the master's "right to be reimbursed by the servant for the damage he is called upon to pay on account of the servant's negligent act." In support of this position, the opinion cites *Sparks v. R. Co.,* 109 S. C., 145; 95 S. E., 344, *Jones v. R. Co.,* 106 S. C., 20; 90 S. E., 183, and *Sparks v. R. Co.,* 104 S. C., 266; 88 S. E., 739, cases also relied upon by the appellants. The test applied was the question: *"How is it possible for the master to exercise his right of reimbursement, with a verdict limiting the liability of the servant * * * obstructing his path?"* It is again contended, following

the viewpoint in the Jenkins opinion, that the existence of the right of reimbursement is hostile to the finding of separate verdicts against master and servant where the tort complained of was that of the servant alone.

7    To establish the liability against the defendant corporation, the plaintiff alleges the tort of the agent, without claim that the master authorized, participated in, or ratified the tort. It is sufficient for plaintiff to show even as a basis of punitive damages, that the servant was acting within the scope of his employment. The master's responsibility for the servant's acts, whether negligent or willful, follows as a matter of law. *Quinn v. R. Co.,* 29 S. C., 381; 7 S. E., 614; 1 L. R. A., 682; *Cobb v. R. Co.,* 37 S. C., 194; 15 S. E., 878; *Rucker v. Smoke,* 37 S. C., 377; 16 S. E., 40; 34 Am. St. Rep., 758; *Skipper v. Clifton Mfg. Co.,* 58 S. C., 143; 36 S. E., 509; *Reeves v. R. Co.,* 68 S. C., 89; 46 S. E., 543.

The rule is different in the Federal Courts, where it is held that a verdict for punitive damages will not be sustained against the master, unless there is proof to implicate the master in the agent's act. *Lake Shore & M. S. R. Co. v. Prentice,* 147 U. S., 101; 13 S. Ct., 261; 37 L. Ed., 97.

*In Schumpert v. So. R. Co.,* 65 S. C., 332; 43 S. E., 813; 95 Am. St. Rep., 802, the position was taken, and strongly urged on behalf of the appellant railroad corporation, that "there is no joint liability unless the master directs or is present, actively co-operating with the servant in the commision of the tort." In support of this contention, the argument, which seems quite closely paralleled by the reasoning in the Jenkins's opinion, was made, suggesting *the matter of contribution* as presenting a difficulty in the way of holding the master and servant jointly liable. After some examination of the authorities cited to support appellant's position, the opinion decided the point against the objection, quoting and adopting the expression on the subject of contribution in Cooley's work on Torts. Following this con-

sideration and review of the authorities, in delivering the unanimous opinion of the Court, Mr. Justice Jones, said:

"* * * In the case of a railroad corporation, which owes important duties to the public or those affected by its operation, and which cannot act, except through agents, there is the strongest reason for holding that with respect to acts done in its service by the agents within the scope of their employment, the corporation is present acting through its agents. *'Qui facit per alium facit per se.'* The servant is liable because of his own misfeasance or wrongful act, in breach of his duty to so use that which he controlled as not to injure another. The master is liable because he acts by his servant, and is therefore bound to see that no one suffers legal injury through the servant's wrongful act done in the master's service within the scope of the agency. Both are liable jointly, because from the relation of master and servant they are united or identified in the same tortious act resulting in the same injury."

Conclusions from the *Schumpert case,* are: (1) The liability of both company and agent to respond to the person injured by the wrongful act of the servant is not qualified or limited, in any respect, by the rights or remedies of the company and agent as between themselves. (2) The rights and remedies of company and agent, in respect to each other, are neither enlarged nor restricted by a verdict finding a joint liability against them in favor of the person injured; the one, who is not in morals a wrongdoer, may call upon the other, who alone is the real wrongdoer, for indemnity.

In *Logan v. R. Co.,* 82 S. C., 522; 64 S. E., 515, *Rookard v. R. Co.,* 84 S. C., 190; 65 S. E., 1047; 27 L. R. A. (N. S.), 435; 137 Am. St. Rep., 839, and *Jenkins v. R. Co.,* 89 S. C., 408; 71 S. E., 1010, it was stated a judgment on the merits in favor of a lessee railroad company would bar an action against the lessor for the same cause, because the liability of the master is predicated upon that of the les-

see; this being summed up in the Jenkins decision, above cited, as follows:

"In other words, if the operating company, the one that actually does the injury, is held not to be liable, it follows that the lessor, upon whom the law imposes liability only for the acts of the lessee, cannot be liable."

In *Sparks v. R. Co.* (the first appeal) 104 S. C., 266; 88 S. E., 739, the verdict exonerated from blame the conductor, through whom the tort is charged; it held the railroad, however, to liability. The Court in reversing the judgment against the corporation, said: "There is only one servant, one intent, and one act, and the case is a pure tort." The opinion further pointed out that this act and intent, which were the two facts to be established against the company, "were traceable * * * *only through the conductor";* and therefore the verdict holding that he was not responsible in intent or act must be held to have the same result in respect to the corporation. There is no discussion or suggestion in this opinion in anywise relating to the master's right of reimbursement, or the rights or remedies of company and agent, as between themselves.

In *Jones v. R. Co.,* 106 S. C., 20; 90 S. E., 183, the railroad company was sued with three of its agents and servants. The verdict was against the company alone. Remarking that the verdict was illogical and could not stand, Mr. Justice Hydrick also commented:

"It would be unreasonable to say that the servant did no wrong, but nevertheless his master is liable, when the only wrong charged against the master is that of the servant."

In *Sparks v. R. Co.* (the second appeal) 109 S. C., 145; 95 S. E., 344, the contention was made that a new trial of all the issues should have been had just as if there had been no former trial, notwithstanding the verdict at the former trial that the conductor was not liable for the tort charged against him. It was held that the rights of the parties in

this respect had been determined by the former appeal. In stating this conclusion, Mr. Justice Hydrick said:

"* * * The Circuit Court correctly ruled that the matters involved in the judgment in favor of Jones were *res adjudicata,* and therefore Jones and his alleged wrongful acts were out of the case, and the company could not be liable for them. In fact, it had been finally adjudicated that Jones had done no wrong. It necessarily follows that the company had done no wrong through the agency of Jones."

As additional and supplemental grounds for the conclusions stated in the two opinions last cited, Mr. Justice Hydrick commented in the *Jones case* that the company, by reason of the verdict which had acquitted the servant of having done any wrong, would be deprived of its remedy against the offending servant or servants because the judgment would be a bar to an action by the company against them. In the *Sparks case* it was similarly commented:

"Moreover, * * * it is perfectly clear that the company will be deprived of that right [to compel the servant to pay the judgment] if it can now be held liable for the acts of Jones after he had been discharged from liability in the same action with the company for the same wrong, for the judgment in his favor would bar an action of the company against him, or any attempt on the part of the company to compel him to pay the judgment obtained against it. As between him and the plaintiff and as between him and the company, it is *res adjudicata* that he has done no actionable wrong."

In *Ilderton v. Charleston Consolidated Ry.,* 113 S. C., 91; 101 S. E., 282, it was held, by a divided opinion, that the case should have been continued, as the motorman O'Quinn, who was the only witness by whom the railroad could make out a defense, was absent in the military service. Mr. Justice Hydrick said that the absent agent, although not a party to the record, was deeply interested in the event of the action, "for, as defendant's liability to plaintiff was predicated solely

upon his conduct, his liability over to defendant will be affected by the judgment." The opinion also quoted from *Logan v. Ry.,* 82 S. C., 518; 64 S. E., 515, where it was said that the judgment, when the agent was vouched to defend, "would be conclusive *as to the amount which the principal had to pay,* and *prima facie* evidence of the liability of the agent to his principal therefor." In the statement of these conclusions, there does not appear any suggestion, even, that the verdict in the action would either give or destroy "the master's right to reimbursement"—*a term which, in fact, seems first to have been used in the recently decided Jenkins opinion.*

It is evident that the additional reasons for the conclusion stated in the *Jones and Sparks cases,* as above set forth, were unnecessary to the decisions. It is elementary that the plaintiff in a tort action must stand upon the allegations of negligence set out in his complaint. If he has alleged his right of recovery upon the negligence of the servant, he cannot recover upon any acts of negligence that are not chargeable to the servant in the manner alleged. Illustrating the application of this principle, it was stated in *Scott v. R. Co.,* 105 S. C., 385; 89 S. E., 1038:

"The defendant was called upon to answer certain specifications. * * * Under the pleadings it would have been justified in showing that it did injure the plaintiff, but in a different way than that alleged, and this would have been a complete defense."

This would have been sufficient answer in the *Jones and Sparks cases* to the contention that a judgment could be held against the company, although the servant, on whose negligence the cause of action depends, had been cleared from responsibility.

In view of the conditions mentioned, it cannot be considered that the discussion of the collateral effect of the judgment was a real factor in the determination of the *Sparks and Jones cases.* The value of the suggested reason,

that the judgment found in such actions should be consistent with the master's right of reimbursement, must therefore be viewed from the standpoint which is so well declared by Chief Justice Marshall, in the notable case of *Cohens v. Virginia,* 6 Wheat. 264; 5 L. Ed., 257:

"It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

While it must be considered, under the principle declared in *Cohens v. Virginia,* above cited, that the authority of the *Sparks and Jones cases* is not binding in this connection, yet the respect which is due such expression of opinion, especially as they were later adopted as a basis for the Jenkins decision, requires that this feature be given substantial consideration. This brings up primarily the question of the legal relations, rights, and remedies of the various parties involved, where an injury is occasioned by the wrongful act of a servant.

The light furnished by the authorities on this subject is of material assistance in helping to decide whether the master's right to call upon the agent for indemnity should be deemed a determining feature, in passing upon the rights of the injured person in an action which undertakes to hold both master and servant to responsibility.

In Cooley's work on Torts, which has been mentioned as the authority mainly relied upon as a basis of decision in the *Schumpert case,* a very clear statement is made at pages 167 and 168 (2d Ed.):

"The law cannot recognize equities as springing from a wrong in favor of one concerned in committing it. But there are some exceptions to the general rule which rest upon reasons at least as forcible as those which support the rule itself. They are of cases where, although the law holds all the parties liable as wrongdoers to the injured party, yet as between themselves some of them may not be wrongdoers at all, and their equity to require the others to respond for all the damages may be complete. There are many such cases where the wrongs are unintentional, or where the party, by reason of some relation, is made chargeable with the conduct of others.

"A case in point is where a railroad company is made to pay damages for an injury caused by the carelessness of one of its servants. Here the injured party may justly hold both the company and its servants to responsibility; but the actual wrong, so far as it is one in morals, is on the part of the servant alone, and the company is holden only through its obligation to be accountable for the action of those to whom it entrusts its business. As between the company and its servant, the latter alone is the wrongdoer, and, in calling upon him for indemnity, the company bases no claim upon its own misfeasance or default, but upon that of the servant himself.

"On the other hand, suppose the servant be directed by the officers of the company to do a certain act which it turns out they had no right to do, and for doing which he is made to pay damages. * * * If the act directed was one he had reason to suppose was legal, and he obeyed directions on that supposition, it would ill become the railroad company to demand that he be treated as a wrongdoer when called upon to indemnify him against the consequences of the act its officers had directed. In such a case the servant is not in morals a wrongdoer at all, and his claim to indemnity would be based upon a faithful obedience to orders

which he had a right to presume were rightful, nothing to the contrary appearing."

Other leading authorities, which treat of the relations, rights, and remedies of the parties in such situation express in substance the same consideration. Thus in Labatt's Master and Servant (2d Ed.), Vol. VII, p. 8011, it is stated:

"There can be no doubt as to the proposition that a servant is directly liable to his master for any damage occasioned by the servant's negligence or misconduct, for which the master is liable to another. As between the master and a stranger, the servant represents the master, and the master is answerable for the servant's acts under the doctrine of respondeat superior. But this maxim does not apply as between master and servant, whose liability is based upon his contract. *He is bound to indemnify the master for damages resulting from his failure to perform the duty which he owes to the master in every case.*"

In Shearman & Redfield on Negligence (6th Ed.) Vol. 11, p. 705, it is said:

*"A servant is liable to his master for any damage, of which the servant's want of ordinary care and diligence in his work, or want of such skill as he had induced in the master to believe that he possessed, is the proximate cause.* And if the master is obliged to pay damages to a stranger for negligence of the servant, in which the master had no personal share, he is entitled to recover over against the servant."

In Freeman's notes on this subject, in 16 Am. St. Rep., 255, stating the reasons justifying recovery in actions to enforce indemnity, it is further said:

*"In each of these cases the party seeking indemnity has been guilty of no personal wrong, actual or presumed, and no principle of public policy forbids the enforcement of indemnity in his favor."*

In a leading and often cited case, *Oceanic S. ? . Co. v. Compania T. E.,* 134 N. Y., 461, 467; 31 N. E., 987, 989; 30 Am. St. Rep., 685, 689, in summing up conclusions based on a review of various authorities and cases, the Co rt said:

"* * * One who has been held legally liable for the personal neglect of another is entitled to indemnity from the latter, no matter whether contractual relations existed between them or not. * * * *The right to in' emnity stands upon the principle that every one is responsible for the consequences of his own negligence, and, if another person has been compelled (by the judgment of a Court having jurisdiction) to pay the damages which ought to have been paid by the wrongdoer, they may be recovered from him."*

See, also, Shearman & Redfield on Negligence (6th Ed.), Vol. 1, pp. 43–55; *Lowell v. Boston & L. R. Co.,* 2 Pick. (Mass.), 24; 34 Am. Dec. 33, 38.

The effect that should be given the first judgment in an action subsequently brought by the defendant, who had to pay the judgment, against the other defendant through whom the liability was established, is also pointed out by other leading authorities.

In 34 Corpus Juris, 1032, the rule is stated:

"A judgment is conclusive upon a person responsible over, in so far as the issues actually litigated in the action are identical with the issues involved in a subsequent action against such person by defendant in the first action. While the judgment will be conclusive on him so far as concerns the facts of the rendition of the judgment, its amount, and the cause of action on which it was rendered, *it will not determine the question whether he is in fact responsible over, nor will it preclude him from setting up any defenses which, from the nature of the action or pleadings, he could not have interposed in the first action had be been a formal party to it. Also the fact that he defended the action does not render him liable to plaintiff for the amount of the judgment."*

To the same effect may be cited the following authorities: 23 Cyc., 1270–1274; 15 R. C. L., 1021; Black on Judgments (2d Ed.) pp. 864–866; note, supported by extensive citations, in 40 L. R. A. (N. S.), pp. 1174–1176; *Burley v. Compagnie De Navigation Francaise* (C. C. A.), 194 F., 335 (syllabus); *Keokuk & W. R. Co. v. State of Missouri,* 152 U. S., 301; 14 S. Ct., 592; 38 L. Ed., 450 (syllabus), "the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered."

In giving effect to the foregoing considerations, in *Oceanic S. N. Co. v. Compania T. E.,* 134 N. Y., 461, 469; 31 N. E., 987, 989; 30 Am. St. Rep., 685, 690, the Court held:

*"The judgment [if obtained against both master and servant] would not necessarily have determined as between them, whether either was or was not primarily liable, because that question could not have been litigated in the first action, at least it could not have been without the consent of all the parties to it, and of the trial Court, and then only through the aid of a special verdict or of a special finding.* * * * In the case at bar, the judgment of the Circuit Court is not conclusive evidence of the liability of the defendant to the plaintiff, nor would it have been, had both been defendants in that judgment. * * * Whether, as between these litigants, the defendant is primarily liable for the damages occasioned by the injury to Cleary, must be determined by evidence outside of the record [in the first action]."

Similarly, in *Washington & Berkeley Bridge Co. v. Pennsylvania Steel Co.* (C. C. A.), 215 F., 32, 35, Judge Woods, formerly an associate Justice of the South Carolina Supreme Court, made the following comment:

"It is perfectly clear that plaintiff's demurrer to the evidence could not be sustained on the ground that a judgment in the case of Benning against the steel company was con-

clusive of the liability of the bridge company to the steel company under the notice to the bridge company that it would be held responsible for any recovery in favor of Benning. That judgment was conclusive as to all matters necessary to Benning's recovery. * * * *But under the general rule the judgment was not conclusive as to matters not necessary for Benning to prove as a condition of his recovery against the steel company.* Note to *Baltimore & O. R. Co. v. Howard County,* 40 L. R. A. (N. S.), 1172."

Under the foregoing authorities, the matters included in the adjudication, and therefore the particulars in which the judgment may be regarded as conclusive, are : (1) The liability of the corporation master to respond in damages for the injuries complained of in the action, as resulting from the act of the agent within the scope of his employment; (2) the negligent and willful tort of the agent in consequence of which the present judgment was procured; (3) the amount of damages caused by the tort of the servant, for the payment of which the master could be justly held responsible by the injured person.

In other matters, the present judgment could not be regarded as conclusive in an action for indemnity subsequently brought by one defendant against another. Thus the amount of indemnity recoverable would be limited, notwithstanding the judgment, to the payment actually made in settlement of the claim of the injured person. *Smith v. Foran,* 43 Conn., 244; 21 Am. Rep., 647. Also, as was said in *Oceanic S. M. Co. v. Compania T. E.,* above cited :

"The judgment would not necessarily have determined [as between the two defendants in the first action] whether either was or was not primarily liable, because [under our practice] that question could not have been litigated in the first action."

Then too, so far as punitive damages based on willfulness are concerned, there might arise the question whether any

principle of public policy would forbid the enforcement of the indemnity. It was said in *Watts v. R. Co.,* 60 S. C., 67; 38 S. E., 240, that punitive damages, in addition to compensating for the willfulness, with which the private right was invaded, were intended to serve "as a deterring punishment to the wrongdoer and as a warning to others." Would the object of the assessment of punitive damages be accomplished if the defendant, against whom the "pecuniary mulct" is imposed, should evade its effect by calling on another for indemnity? We have not found any cases, either in our own researches, or in any of the authorities cited in support of the view expressed in the Jenkins opinion, in which the consideration of this question is indicated.

It is sufficient to say that in the present case the sole issue under the pleadings is the plaintiff's right of recovery against the defendants. He asked both actual and punitive damages. The answer, in which the defendants joined, makes complete denial of liability. The proof connected the defendant Dorsey's act with the injury. It was not necessary for plaintiff to go beyond this, or to show that the corporation authorized or otherwise actively participated in the tort. The test of liability against the railroad was whether Dorsey was acting within the scope of his employment. Whether he was acting under instructions, or whether he was disobeying instructions, would not have been a defense either for himself or for the company. The company undertook to defend, instead of disavowing, the agent's act. The agent was kept in the employment of the company; and it is not to be supposed that he would volunteer evidence to increase the damages against the company by undertaking to place the primary responsibility for his acts upon superior officers of the company.

The relations, rights and remedies of company and agent, as between themselves, would ordinarily involve matters of general rules and regulations of the company, special instructions, customary practices concerning the handling of

the business in which the agent was engaged, and also, the degree of care, skill, and good judgment that could properly be expected of the agent under all the conditions of his employment. It might happen, for instance, that the injury was caused through the unskillfulnes or inexperience of the agent. In an action by the injured person, this could not have been set up as a defense, either for the agent or for the master; but, as between master and agent, if the master failed to sufficiently instruct the agent as to his duties, or if, with knowledge of the inexperience and unskillfulness of the agent, the master should require him to do work for which he was unfit, it is manifest that the agent, rather than the master, might be justified in calling upon the other for indemnity on account of the damages he had to pay the injured person.

These conditions make it necessary to consider each action as standing on its own base. The defendants upon whom the verdict imposes liability are left free to take subsequent action, without their rights or remedies being curtailed. This conclusion is in full accord with the declaration of the Court in *Schumpert v. Railway Co.,* and we are unable to see how it is hostile in any degree to a proper consideration and application of the doctrine of respondeat superior, or the theory of the master's right to call upon the servant for indemnity on account of the servant's negligent or willful act.

It is commented in the majority opinion in the *Jenkins case* that the overwhelming weight of authority is against the South Carolina rule allowing the apportionment of damages by separate verdicts against the tortfeasors joined as defendants in the action. Among the citations of authority supporting this statement, are noted *Washington Gaslight Co. v. Lansden,* 172 U. S., 534; 19 S. Ct., 296; 43 L. Ed., 543; Cooley on Torts; *Currier v. Swan,* 63 Me., 323; *Lake Erie & W. R. Co. v. Halleck,* 78 Ind. App., 495; 136 N E., 39; and *Hall v. McClure,* 112 Kan., 752; 212 P., 875;

30 A. L. R., 782. Mention of these particular authorities is made because of the light they give on the reasons for the position taken in the Jenkins opinion, that the South Carolina rule, because of its departure from the rule of common law, "should be confined to the precise condition which gave it birth."

In Cooley on Torts (2d Ed.), p. 153, it is stated:

"To require the party injured to ascertain and point out how much of the injury was done by one person and how much by another, or what share of responsibility is fairly attributable to each as between themselves, and to leave this to be apportioned among them by the jury according to the mischief found to have been done by each, would, in many cases, be equivalent to a practical denial of justice. The law does not require this, but on the other hand permits the party injured to treat all concerned in the injury as constituting together one party, by their joint co-operation accomplishing certain injurious results, and liable to respond to him in a gross sum as damages."

In the cases of *Currier v. Swan, Lake Erie & W. R. Co. v. Halleck,* and *Hall v. McClure,* it was held that the attempted apportionment of damages should be stricken out as surplusage and a joint judgment entered against all the defendants for the full amount of the verdict assessed in plaintiff's favor. An extensive review of authorities supporting this position, including the citations of cases from various other jurisdictions, is made in *Hall v. McClure,* 112 Kan., 752; 212 P., 875; 30 A. L. R., 782, and the note following at page 794.

It is manifest from the consideration of these authorities that the South Carolina rule, allowing apportionment of damages, must be regarded as more favorable to the defendants than the general rule which "compels each to assume and bear the responsibility of the misconduct of all." It is equally manifest that the order of Judge Rice, in reducing the verdict for actual damages to a joint liability for

the amount found against the agent, is much more favorable to the defendants than the position taken in *Hall v. McClure* and other cases cited above, where, in giving application to the general rule, the attempted apportionment was stricken out as surplusage and the plaintiff allowed to recover against all of the defendants the gross amount of the judgment found in his favor. The plaintiff was entitled to damages to the full extent of the injuries he had sustained; but, if effect be given, as it must be, to the doctrine of respondeat superior, the plaintiff could not have a greater verdict for actual damages against the corporation than the amount of damages which he suffered at the hands of the agent. The trial Judge, having to decide between striking out the attempted apportionment as surplusage (a matter which has never been passed upon in this State) or reducing the verdict, exercised his power of control over the finding of the jury, by granting a new trial *nisi,* which required the plaintiff to remit the excess above the amount of the verdict found against the agent.

But whatever the argument that might be made against the apportionment of actual damages, an essentially different situation arises in respect to the issue of punitive damages. The theory of punitive damages has been variously stated as "vindication of private right," "punishment for wrong," "deterring punishment to a wrongdoer," and "a warning to others." A verdict for punitive damages must therefore be regarded as a penalty or punishment. The material factors in determining the amount that should be assessed as punitive damages are: (1) The nature of the act complained of and the circumstances of willfulness and wantonness attending the act; (2) the pecuniary conditions of the defendants who are to be punished. The importance of this latter factor has been frequently pointed out in our decisions. *Rowe v. Moses,* 9 Rich. Law (43 S. C. L.), 423; 67 Am. Dec., 560; *Burckhalter v. Coward,* 16 S. C., 439; *Elms v. So. Power Co.* and *Rosamond,* 79 S.

C., 502; 60 S. E., 1110; *Calder v. So. Ry. Co.* and *Pullman Co.,* 89 S. C., 287; 71 S. E., 841, Ann. Cas., 1913–A, 894. In discussing this subject in the *Calder case,* Mr. Justice Gary said:

"The reason of the rule, admitting evidence of the defendant's wealth and pecuniary ability, rests in the consideration that a pecuniary mulct, which would operate as a sufficient punishment, to a man of small means, would be inadequate in the case of a person of great wealth, and what would be a proper penalty in the latter case would be excessive and immoderate in the former. *The rule admitting such evidence is indeed, it has been said, a fair corollary of the rule of exemplary damages."*

It may also be noted that in the case of *Elms v. So. Power Co. and Rosamond, supra,* the action was brought against the corporation and its agent as joint tortfeasors for injuries occasioned by the negligent and willful tort of the agent Rosamond. It was held that testimony to show the wealth of the defendant corporation was responsive to the allegations of the complaint demanding exemplary damages.

Even where evidence concerning the wealth of the defendants is not given, it has been said that such consideration is nevertheless a factor inseparably connected with the estimation of punitive damages. Thus, in *Webber v. Town of Jonesville,* 94 S. C., 189; 77 S. E., 857, Mr. Justice Hydrick stated:

"In estimating punitive damages, the jury have the right to consider the ability of the defendants to pay. And, while there was no testimony as to the wealth of any of the defendants, yet we know that juries consider such matters when they know the facts, even in the absence of testimony. * * * An amount which would be moderate punishment for the one might result in financial ruin to the other."

In the Federal Court, a different rule prevails. Besides holding that proof to implicate the Master in the agent's acts is required as a condition of imposing punitive damages,

it is further held that, in an action brought against several joint tortfeasors, evidence is not admissible as to the wealth of any of the defendants. The difference between the South Carolina and Federal position in this respect appears very clearly in *Washington Gaslight Co. v. Lansden,* 172 U. S., 534, 553; 19 S. Ct., 296, 203; 43 L. Ed., 543, 550, in which the salient points, appearing in the discussion, are the following:

(1) *"Punitive damages are damages beyond and above the amount which a plaintiff has really suffered, and they are awarded upon the theory that they are a punishment to the defendant."*

(2) "There is no justice in allowing the recovery of punitive damages in an action against several defendants, based upon evidence of the wealth and ability to pay such damages on the part of one of the defendants only."

(3) "This rule," it is said, "does not prevent the recovery of punitive damages in all cases where several defendants are joined. *What the true rule is in such case is not perhaps certain."*

(4) "The Court cannot say to the jury [under the Federal rule, which the opinion distinguishes from the South Carolina rule] that the evidence of the wealth of the corporation is only received in regard to it and as furnishing a basis for a computation of exemplary damages against it. If received at all it must be received against all the defendants, as but one verdict can be given against all who are found guilty, when in truth in regard to all of them but the corporation it is evidence which is absolutely incompetent."

The inconsistency of the situation presented under the Federal rule is obvious. Damages awarded as punishment to the defendant must, in order to be fairly assessed, take into consideration his ability to pay. The fundamental character of such requirement is manifest by the statement in the *Calder case:* "The rule admitting such evidence is indeed, it has been said, a fair corollary of the rule of ex-

emplary damages." It is equally true, as stated by Justice
Hydrick in the *Webber case,* "that juries consider such mat-
ters when they know the facts, even in the absence of testi-
mony." Yet, it would, quite evidently, defeat the theory
and object of punitive damages, in addition to the injustice
that it would cause, to let evidence of one defendant to the
neasure of punishment imposed upon others. In conse-
quence of these conditions, there is reflected in the *Lansden
case* an uncertainty, which the Court refers to but does not
undertake to clear up, as to the true rule that should de-
termine the recovery of punitive damages in actions against
joint tortfeasors.

The grounds of reasoning supporting the ruling of the
*Lansden case* have become a matter of especial interest and
importance in our consideration, because of the reliance
placed upon this decision to support the conclusions ex-
pressed in the Jenkins opinion. In our review of the Jen-
kins decision, we face a position already taken by this Court,
although by divided opinion, a continued advocacy of such
viewpoint by the writter of the Jenkins opinion, based on
earnestness of conviction and presented with great capa-
bility, and the background of the high authority of the
United States Supreme Court. Yet, while these matters
are due the highest consideration and regard, it cannot be
overlooked that the viewpoint thus presented is altogether
inconsistent with the policy of our former decisions, as in-
dicated by the *Elms, Calder,* and *Webber cases,* above cited,
as well as by the early rule concerning the apportionment of
damages. To sustain the Jenkins opinion would be, in fact,
to overrule and destroy this established line of decisions,
because, as was clearly shown in the *Lansden case,* one de-
fendant could not justly be held liable in punitive damages
measured by the wealth of some other defendant. Either
it must be placed within the province of the jury to find
separate verdicts, or the rule permitting the consideration of
evidence of the wealth of the defendants must go out of the

issue of punitive damages.    There is no middle ground between these two propositions.

Having to decide between such alternatives, we cannot doubt that the policy of allowing separate verdicts is preferable.    The rule of one verdict against all the defendants found guilty will almost always cause the entire punishment to fall upon one alone.    The other defendants will then be freed and discharged from liability on the judgment, thus being enabled, notwithstanding the "example" of the verdict "for the public good," to wholly evade the penalty and defeat altogether the ends of justice.    The policy of separate verdicts, on the other hand, requires that, in fixing the amount of punitive damages, the pecuniary conditions of the defendants should be considered.    One defendant may show small means; the great wealth of another may be shown; and in each instance the amount of the verdict may be considered by the jury, fairly and justly, from the sound standpoint of assessing such amount of punitive damages as to operate as adequate punishment.    The defendants are thus required to pay, each according to his own means.    The enforcement of the judgment against one defendant does not relieve other defendants from their own responsibility to respond for willful tort.

The policy governing our decision in award of punitive damages is not changed because of the relationship of master and servant, under which liability is imputed to the master.    The basis of holding the master liable for the misfeasance of his agent, is stated in Story on Agency, Par. 452, quoted with approval by Mr. Justice McGowan in *Reynolds v. Witte,* 13 S. C., 5, 18; 36 Am. Rep., 678, and again quoted in the discussion of the master's liability for exemplary damages in *Rucker v. Smoke,* 37 S. C., 377; 16 S. E., 40; 34 Am. St. Rep., 758, as follows:

"In every such case the [master] holds out his agent as competent and fit to be trusted, and thereby, in effect, he

warrants his fidelity and good conduct in all matters within the scope of his agency."

This furnishes the test of the master's liability to respond for punitive damages, which is in no respect different, except as a jury may consider the matter in assessing the amount of damages, from the liability to respond on account of participation in the tort. It is held that the rule grows out of the relation of principal and agent, and makes no distinction between corporations and individuals. The operation of the rule and the reason for its existence has probably never been better stated than in the case of *Rucker v. Smoke, supra,* where Chief Justice McIver said:

"When one person invests another with authority to act as his agent for a specified purpose, all of the acts done by the agent in pursuance, or within the scope of his agency, are, and should be, regarded as really the acts of the principal. If, therefore, the agent, in doing the act which he is deputed to do, does it in such a manner as would render him liable for exemplary damages, his principal is likewise liable, for the act is really done by him. To apply this doctrine to the facts of the case under consideration: If Smoke was appointed by Buyck as his agent to seize the mule covered by the mortgage, and he made the seizure which he was deputed to make in such a manner as would render him liable for exemplary damages, then Buyck would also be liable, for the reason that, both in law and in common sense, Buyck must be regarded as having himself done the act complained of."

The agent Dorsey was, in the present case, placed in his position of authority as railroad police captain and special officer, because of his employment by the railroad corporation. The penalty imposed on the corporation tempered, as remarked by the trial Judge, according to its ability to pay, is calculated to bring home to the responsible officers the need of exercising a more efficient control and supervision over the acts of its agents.

The substance of liability for punitive damages depends upon the proper ascertainment of an adequate penalty to have disciplinary effect on the policies of the corporation, as represented and carried out by the acts of its agents.

It is contended, however, that, if the master's right to call upon the agent for indemnity be not destroyed by the separate verdict and judgment, then no benefit can accrue to the agent, and that the entire liability, the Master's as well as his own, would be cast upon the agent. The answer to this contention is that, when the Master seeks indemnity against the agent in a subsequent action, new relations, rights, and remedies are involved, that present a different subject of consideration from that decided by the jury in the original action. Each action stands on its own merits as a suit at law. Questions of primary liability for the tort and matters of public policy affecting the right of enforcing reimbursement must be decided in the second action. They have no place in the first. It is the function and duty of the jury, if, in the action by the injured person, they should find a verdict against the defendants, to find the amount of damages, whether actual or punitive.

There are settled rules governing our decisions and practice, which must be recognized as having been adopted for the purpose of serving generally the interests of a fair administration of justice, rather than to meet the possible hardships of a special situation. Under these rules, as has been repeatedly stated, the jury, in an action at law, are charged with the duty of deciding the facts and rendering a verdict on the issues presented by the pleadings. This Court has no power to review their findings or to disturb the verdict, unless legal error is evident. It is particularly a matter for the jury to decide what penalty or punitive damages will be calculated to serve as an adequate corrective influence, and how much damages should be imposed.

The writer of this opinion regrets exceedingly that Mr. Justice Cothran "labored in vain" for so many years to bring about the conclusion which he finally prevailed upon getting this Court to adopt in the famous Jenkins decision. With all due deference to the distinguished justice, however, the writer is disposed to think that it would have been better for the administration of justice in this state if the labors of his learned brother had continued "in vain," and had not been even temporarily successful. The writer admits, too, that there is some strength in the suggestion that it would be better perhaps not to "compass" the destruction of a decision "before the ink is dry upon that decision," except in instances where the decision destroyed is absolutely out of harmony with the holdings of this Court for many years, and when the effect of the decision is to bring about an upheaval in the administration of justice in our Courts. A decision of this kind the writer conceives the Jenkins opinion to be. When a decision should be overruled, however, for the excellent purpose of aiding "in bringing our people to a greater respect of our laws and the Courts," this Court should not hesitate to overrule it, just as was done with the cases of *State v. Sullivan*, 127 S. C., 186; 121 S. E., 47, and *Barron v. Liberty National Bank*, 131 S. C., 443, 128 S. E., 414. In the two cases last mentioned, "hardly before the ink was dry" upon them, Mr. Justice Cothran wrote opinions encompassing their destruction, and the writer hereof gladly concurred therein, as will be shown by the recent cases of *State v. Renew*, 136 S. C., 302; 132 S. E., 613, and *Antley v. New York Life Insurance Co.*, 139 S. C., 23; 137 S. E., 199.

The first and second exceptions relate to matters of testimony. Plaintiff, as a witness, on cross-examination, was asked, "Who told you to confer with Mr. Baker (one of the attorneys for the plaintiff)?" He replied, "Mr. Smyre," who, it appears, was in charge of the Union News Company

in Charleston, the employer of the plaintiff; and he made this further statement, "He didn't exactly direct me to him, but he mentioned Mr. Baker and several other men's names in Florence." Questioned by his own attorney, plaintiff stated that he took up the matter with Mr. Smyre on the same day of the occurrence alleged in his complaint. Examined further, by counsel for appellants, he was asked this question, "He recommended that you take the matter up with a lawyer?" The reply was, "No; he said I could if I wanted to."

Mr. Smyre, referred to by counsel for the appellants and the witness, was placed on the stand by the defendants. He was asked if he had recommended some lawyers, among them Mr. Baker, to the plaintiff. His reply was, "I did not; I did not know Mr. Baker; I had heard of him." When Mr. Smyre made the reply, which we have quoted, Mr. Baker, of counsel for the respondent, made this statement, "It is immaterial whether Mr. Smyre mentioned me or not." Judge Rice remarked that he did not think the matter was material.

The admission or rejection of testimony must be left very much to the discretion of the trial Judge. We do not think there was any abuse of discretion in this instance. In the first place, it cannot be held that the testimony offered, was ruled out. Again, the testimony was not really a contradiction of the plaintiff's statement, and we presume that it was offered for that purpose. It will be noted that the plaintiff did not testify that Mr. Smyre had "recommended" the attorney, Mr. Baker, to the plaintiff. The testimony of Mr. Smyre was to the effect that he had not made such recommendation. In any event, the testimony was not of any importance, and was a collateral matter.

When the defendant Dorsey was a witness, he was asked, without objection, if he, as a police officer, at any time had occasion to locate whisky on the property of the railroad company, and, to that inquiry, he replied in the affirmative. Thereupon appellants' counsel asked him this question, "Was it at that time or previous to that time an unusual thing for whisky to be found on the premises of the company?" There was objection by the plaintiff, which was sustained. We are unable to see any harmful error in the refusal to admit this testimony, especially in view of the fact that the witness had already testified that previous to the occurrence alleged in the complaint he had had occasion to locate whisky on the property of the company.

It is the judgment of this Court that all exceptions of the appellants be overruled, and that the judgment of the Court of Common Pleas of Florence County be, and the same is hereby, affirmed.

MR. CHIEF JUSTICE WATTS and MR. JUSTICE STABLER concur.

MR. JUSTICE COTHRAN (dissenting): The effect of a decision of this appeal, in conformity with the opinion of Mr. Justice Blease, will be to overrule the case of *Jenkins v. R. Co.,* 130 S. C., 180; 125 S. E., 912, in so far, at least, as that case holds that in a joint action against a master and his servant, *based upon the alleged willful act of the servant alone,* a verdict for *punitive* damages cannot be apportioned, so as to award a greater sum against the master than against the servant.

The *Jenkins case* was a joint action against both master and servant, based upon the alleged willful act of the servant alone, just as the present action is, so far as punitive damages are concerned; it was not based, as this action is not based, upon an alleged joint tort, participated in by both defendants.

It should be appreciated at the outset, what the case *does not* decide, as well as what it *does* decide:

(1) It *does not* decide that in a joint action against a master and his servant, *based upon a tort which was the result of the combined negligence of both,* a verdict for *actual* damages cannot be apportioned between them. On the contrary, it recognizes the authority of the case of *White v. McNeily,* 1 Bay, 11, and the cases cited following that decision, which hold that apportionment under such circumstances is premissible.

(2) It *does not* decide that in a joint action against a master and servant, *based upon a tort which was the result of the combined willfulness of both,* a verdict for *punitive* damages cannot be apportioned between them. That question did not arise in the *Jenkins case,* and consequently was not decided. *It does not arise in the case at bar.* The entire argument of Mr. Justice Blease is directed to sustaining apportionment in a case of that kind, *which is not the case at bar.*

(3) It *does* decide, as above stated, that in a joint action against a master and his servant, *based upon a tort which was the result of the willful act of the servant alone,* a verdict for *punitive* damages cannot be apportioned. That is the issue upon this appeal, and not that indicated in the second subdivision above.

The facts are sufficiently stated in the opinion referred to, and need not be repeated. It is conceded on all sides that the tort complained of was *that of the servant alone,* the master not having authorized, participated in or ratified the alleged willful act of the servant.

The defendants were the railroad company and two of its employees, Brown and Dorsey. The verdict exonerated the defendant Brown, and found against the railroad company actual damages, $500, and punitive damages, $1,500,

and against the defendant Dorsey actual damages, $200, and punitive damages, $300.

Upon a motion for a new trial by both of the defendants against whom the verdict had been rendered, the presiding Judge, his Honor Judge Rice, granted a new trial *nisi,* requiring the plaintiff to remit $300 of the actual damages found against the railroad company, and adjudged that, "in the event of such remission, the plaintiff shall be authorized to enter judgment in the sum of $200 *jointly* against the defendant Dorsey and the defendant Atlantic Coast Line Railroad Company. As to the cause of action for punitive damages, the plaintiff may enter judgment against the two defendants separately, in accordance with the findings made by the jury." He held:

"While the finding by the verdict is the amount of $700, as the gross sum of actual damages sustained by the plaintiff, yet the sum of $200 only was found as the amount of actual damages caused by Dorsey. There is an apparent inconsistency in these two findings; and it would seem that the rule for the apportionment of damages according to the different degrees of guilt of the two defendants does not properly apply to this situation.

"Under such circumstances, it is my opinion that, as to actual damages, the verdict should be modified and the plaintiff be permitted to have judgment in the sum of $200; this to be a judgment jointly against the defendant Dorsey and the defendant Atlantic Coast Line Railroad Company."

In effect he held that *actual* damages could not be apportioned, while *punitive* damages could be apportioned between the defendants "according to the different degrees of guilt," thus establishing as the criterion upon the issue of apportionment the *character* of the damages awarded, *actual* or *punitive*—if actual, no apportionment; if punitive, apportionment—a criterion which I shall endeavor to demonstrate is illogical and improper. The result was that, after the

remission of $300 as required, judgment was entered against the railroad company for $1,500 punitive damages, against Dorsey for $300 punitive damages, and against the two jointly for $200 actual damages; making $2,000 in all.

The defendants have appealed upon various grounds, only one of which I shall discuss, namely, the exception based upon the proposition declared in the *Jenkins case, supra,* that in a joint action against a master and his servant, *based solely upon the alleged willful act of the servant,* a verdict for punitive damages cannot be apportioned between them.

My opinion is that, as relating to the power of a jury to render a verdict apportioning the damages awarded, between the defendants, in actions instituted jointly against the master and the offending servant, based wholly or in part upon the negligent or willful tortious act of the servant, the test is whether the facts show a case of *joint wrongdoing,* whether the injury was the result of the participation of both master and servant in the tort complained of.  If it was, there can be no contribution or reimbursement, as between the joint tortfeasors, and consequently, there can be no objection, under the decisions of this Court, to an apportionment.  If it was not, but was the sole act of the servant, in which the master did not participate by authorization, ratification, or otherwise, and is sought to be held liable solely under the principle of *respondeat superior,* the master's unquestionable right of reimbursement cannot legally be destroyed or diminished, as it will necessarily be, by an apportionment.

The test is not whether the damages awarded are *actual* or *punitive,* and upon that issue determine the question of apportionment, as has been done in the order of the Circuit Judge and in the opinion of Mr. Justice Blease; but whether the Master is entitled to reimbursement from the servant for the damages he may be compelled to pay, and that de-

pends upon whether the tort complained of was the sole act of the agent, or an act in which both participated.

Joint actions against both master and servant are of two kinds:

punitive damages should be punished according to his ability participated in the tort which produced the injury, or where the master has been guilty of an act of negligence or willfulness and the servant has been similarly guilty, both acts concurring in producing the injury. A case of joint *wrongdoers* or tortfeasors, as the expression is, is then presented. Under such circumstances there can be no right on the part of the master to contribution or reimbursement, and under the decisions of this Court, the apportionment of damages is permissible. *This extends to actual as well as to punitive damages.*

(2) Where the master has not at all participated, by authorization, ratification, or otherwise, in the act of negligence or willfulness (*the act being solely that of the servant*), but whose liability for the act of the servant is imputed to him by reason of the relation, under the rule of *respondeat superior.* A case of *joint wrongdoers* is *not* then presented. Under such circumstances, the right of the master to reimbursement is universally recognized, and the power of apportionment of damages is denied.

It does not make any difference whether the *act* of the servant has been negligent or willful, the damages actual or punitive, the existence of the right of reimbursement is hostile to the power of apportionment.

There cannot be a question but that the complaint in this case is predicated upon the "negligent and willful" act of Dorsey, the servant of the railroad company, *alone.* There is not a suggestion in the complaint, or in the evidence, or in the argument of counsel, of any direct participation of the railroad company in the alleged act of Dorsey. The ab-

stract of the complaint set out in the "case" fully justifies
this statement:

"It is alleged in the complaint that the defendants J. A.
Dorsey and J. D. Brown were in the employ of the defend-
ant Atlantic Coast Line Railroad Company in the capacity
of captain of police and subordinate in police department of
the Atlantic Coast Line Railroad Company; that about the
10th day of April, 1922, plaintiff was in the employ of the
Union News Company as a news butcher; that upon reach-
ing Florence on one of his regular trips on that particular
date he was standing near the train, when the defendant
Brown touched him on the shoulder and requested him to
go in the car in which his equipment was situated, and that,
upon doing so, he found the defendant J. A. Dorsey stand-
ing near the equipment, and that said J. A. Dorsey, in a
loud and boisterous manner, demanded that plaintiff unlock
his hampers, claiming to have information that plaintiff had
been transporting whisky, and threatened that, unless plain-
tiff did open his hampers to be searched by the defendants
Dorsey and Brown, they would place him under arrest, pro-
cure a search warrant, and search same, whereupon, believ-
ing that, if he did not allow a search, he would be placed
under arrest, which would cause publicity and humiliation,
as well as loss of time by being detained from his run, he
opened his hampers, and a thorough search was made by the
defendants J. A. Dorsey and J. D. Brown; that, finding
nothing, they then demanded his grip, which was in the
baggage coach, and, under the same circumstances, plaintiff
opened his grip and another search was made by the same
defendants, but no alcoholic beverages were discovered; that,
upon returning to Florence on the afternoon of the same
day, he saw the defendant J. A. Dorsey and asked him his
name, whereupon the names of the defendants Dorsey and
Brown were furnished him, but the defendant Dorsey ap-
peared to become enraged, and, in the presence of a number

of people, cursed and threatened plaintiff, much to his humiliation and chagrin; that the said rude, offensive, negligent, willful, and wanton acts of the said J. A. Dorsey and J. D. Brown, pretending to act in their capacity as agents and policemen of Atlantic Coast Line Railroad Company, was a trespass upon the plaintiff's rights as a free citizen; and that, as a result of said trespass, plaintiff was injured, in that he was restrained from the enjoyment of his liberty and deprived of his legal rights as a free citizen for the length of time that it took him to open his hampers and baggage, and in that the search conducted by them was unlawful, constituting a trespass upon his property and rights, and he further suffered great humiliation and embarrassment in having a false charge made against him in public, all to his damage in the sum of $10,000."

The case then falls under the third division above stated, where the master is sought to be held liable solely under the principle of *respondeat superior,* for the tort solely of the servant.

There can be no doubt as to the proposition that there can arise no right of reimbursement or contribution as between joint *wrongdoers.* See authorities cited by Mr. Acting Associate Justice Ramage, in *James v. Telegraph Co.,* 130 S. C., 533, at page 540; 126 S. E., 653. It is equally well established that, where a master is made to respond in damages for the tort of his servant, whether negligent or willful, under the principle of *respondeat superior* (where he has not participated in the tort), the master is entitled to reimbursement from the servant for "the compensation which the employer has been obliged to make to third persons for injuries sustained by him." 18 R. C. L., 502. "If the company is liable to plaintiff, the servant or servants whose wrongful acts or omissions actually caused the injury are liable over to the company for the amount which it will be

compelled to pay on account thereof." *Jones v. Railroad Co.,* 106 S. C., 20; 90 S. E., 183.

It follows logically and inevitably that in the last-named circumstance the master and the servant cannot be considered as joint wrongdoers; the servant is held liable because he personally committed the tort; the master is held liable, not because he committed it, for he did not, but because under the principle of *respondeat superior,* a matter of public policy, he must respond *vicariously* for the wrong of the servant; a case of constructive, imputed liability.   As is said in *Cooley, Torts,* 145, quoted with approval, not only in the Supreme Court of the United States (*Southern R. Co. v. Carson,* 194 U. S., 136; 24 S. Ct., 609; 48 L. Ed., 907), but in the Supreme Court of this State (*Schumpert v. Railroad Co.,* 65 S. C., 332; 43 S. E., 813; 95 Am. St. Rep., 802) :

"As between the company and its servant, *the latter alone is the wrongdoer,* and in calling upon him for indemnity the company bases no claim upon its own misfeasance or default, but upon that of the servant himself."

It is conceded by counsel for the plaintiff, that the law is thus correctly stated in 18 R. C. L., 502, which they quote:

"An employee is directly liable to his employer for any damages occasioned by his negligence or misconduct, whether such damages be direct to the property of the employer, *or arise from the compensation which the employer has been obliged to make to third persons for injuries sustained by them."*

In *Jones v. Railroad Co.,* 106 S. C., 20; 90 S. E., 183, the action was based solely on the alleged delict of the servant: the verdict was in favor of the servant and against the servant and against the railway company.   The Court held that it could not stand.   "It would be unreasonable to say that the servant did no wrong, but nevertheless his master is liable, when the only wrong charged against the master

is that of the servant." As a further sustaining ground for its position, the Court declared:

"The company's liability is predicated solely upon the conduct of its servants under the doctrine *respondeat superior;* and, under the facts and circumstances proved, if the company is liable to plaintiff, the servant or servants whose wrongful acts or omissions actually caused the injury are liable over to the company for the amount which it will be compelled to pay on account thereof. But, as the verdict acquits both the servants of having done any wrong, the company is deprived of its remedy against the offending servant or servants, because the judgment in this case would be a bar to an action by the company against either or both."

In *Sparks v. Railroad Co.,* 109 S. C., 145; 95 S. E., 344, it is said:

"Moreover, if Jones' [the servant's] wrongful acts had caused the injury, and the company had been made to pay damages therefor under the doctrine of *respondeat superior,* the company would have had a right of action over against him, *or, being a party to the action with the company, it would have had the right to compel him to pay the judgment."*

See, also, *Sparks v. R. Co.,* 104 S .C., 266; 88 S. E., 739. *Ilderton v. R. Co.,* 113 S. C., 91; 101 S. E., 282. *Beauchamp v. Winnsboro Co.,* 113 S. C., 522; 101 S. E., 856.

So then it appears to be perfectly clear that, in a case of the *imputed liability* of the master, in which he is entitled to reimbursement, whether the damages be actual or punitive, to permit the apportionment of damages necessarily destroys the master's right of reimbursement from the servant. For instance, if in such a case (not one of *joint tort,* but of *imputed liability*), where the servant has been convicted of negligence simply, from which actual damages ensue, the verdict apportions $500 damages against the master and $200 against the servant, the master's right of reimburse-

ment is destroyed completely; for, after paying the judgment against himself for $500, he cannot claim reimbursement from the servant of the $500 so paid, for the reason stated in the *Jones case* above quoted, that the judgment in the case would be a bar to an action against the servant and adjudication that the servant should be discharged upon the payment of the amount $200 *to the plaintiff;* and for the further reason that to allow reimbursement even to the limited amount found against the servant would subject him to a double payment of the same sum which the verdict establishes as due by him *to the plaintiff.*

Under similar circumstances, if the servant has been convicted of a *willful tort,* from which punitive damages ensue, and the verdict apportions $1,500 damages against the master, and $300 against the servant, the master's right to reimbursement is destroyed completely, for the same reasons.

If the right of reimbursement be not destroyed by the apportionment of the verdict, in a case where it unquestionably can be exercised, as where the tort is the act solely of the servant, what possible alleviation to the servant would result from such apportionment? He will be under obligation to reimburse the master for the amount, however great it may be. In fact, he will be in a worse fix, for he will have the judgment against himself to pay also. It does not appear, therefore, that the argument that the corporation should pay in proportion to its wealth and in consideration of its immunity from corporal punishment is entitled to any consideration; or that the poor man will be benefitted by a smaller award against him.

The situation is obviously different in a case of joint wrongdoers, as where the master and the servant are jointly sued for damages resulting from a negligent or willful tort in which they both participated. In such case, according to the admittedly exceptional attitude of this Court upon the

question, the damages may be apportioned, for the master could not call on the servant for reimbursement.

The case of *Nelson v. Halvorson,* 117 Minn., 255; 135 N. W., 818, Ann. Cas., 1913-D, 106, cited by his Honor Judge Rice, was a case of *joint wrongdoers,* and has no application to a case of *imputed* liability.

I concede, as the decisions of this Court have over and over held, that, even in a case where the master has not participated at all in the tort of the servant, by authorization, ratification, or otherwise, he is liable in *punitive* damages for the willful tort of the servant, as well as for *actual* damages for the tort. I conceded also that the state rule is in conflict with that announced by the Supreme Court of the United States.

I concede also that the rule of apportionment of actual damages, as declared in the case of *White v. McNeily,* 1 Bay, 11, is in conflict with the rule announced by the Supreme Court of the United States in the case of *Washington Co. v. Lansden,* 172 U. S. 534; 19 S. Ct., 296; 43 L. Ed., 543.

*I do not concede* that the rule as to proof of the defendant's wealth, in cases of willful tort, is different in the two jurisdictions. I think that they are the same; the *Lansden case* does not hold to the contrary. *Brown v. Evans* (C. C.), 17 F., 912.

These variances do not at all affect the question now before the Court. That question is: In a case (*not* of joint tort-feasors), where it is sought to hold the master liable in punitive damages for the sole, willful act of the servant, can a verdict be sustained which awards greater punitive damages against the master than against the servant? *That question has never been answered by this Court, except in the Jenkins case.* It seems to me of exceedingly doubtful consistency in those so fervently imbued with the commendable spirit of "bringing to our people a greater respect for

our laws *and the Courts,"* hardly before the ink is dry upon
that decision, to compass its destruction.

No one questions the academic observations in the opin-
ion of Mr. Justice Blease, that the defendant in an action for
punitive damages should be punished according to his ability
to respond; that what may be punishment to a poor man
would amount to nothing more than to flick a speck from a
rich man's sleeve; or that a corporation, which cannot be
subjected to corporal punishment, should be financially pun-
ished in consideration of that immunity which the individual
does not enjoy; or that "certainly in instances where the
law of the land has been *purposely evaded* or positively in-
fringed by an artificial person (a corporation, I interpolate),
whose invisible person cannot be physically touched, such
artificial person should be required, in the only way in which
the law is able to reach it, to be made to suffer punishment
sufficient to meet the offense"—observations, I deferentially
suggest, entirely wide of the mark, and *assuming the par-
ticipation of the corporation in the tort complained of,* the
differentiating circumstances in the whole discussion.

The suggestion that "in many instances, such damages
(actual) may be measured in dollars and cents, it being or-
dinarily a matter of calculation only to estimate the value of
time, loss of money, physicians' bills and many other items
generally included in damages of that class," while in the as-
sessment of punitive damages there is no exact measure-
ment, etc., certainly has no application to the present case,
where no such items of damage were claimed; the difficulty
in the one case, the absence of a "yardstick," is as great as
in the other.

This statement also occurs in the opinion of Mr. Justice
Blease:

"To follow the reasoning in the *Jenkins case* to its last
analysis would amount to saying that some impecunious in-
dividual, agent of a wealthy corporation, for a willful tort
committed by him, would not only have to pay the same

amount of money damages as that required of his corporate employer, but, in addition thereto, the agent might have to suffer punishment more severe than the payment of money, while the corporation could escape with only pecuniary loss, and that in no greater amount than the sum assessed against its agent."

This is necessarily true, where the master and the servant are jointly sued upon a cause of action based solely upon the willful act of the servant; it is an inevitable result of the election which the plaintiff exercised of suing them jointly instead of singly, which he unquestionably had the right to do. And, even if he had sued them singly, the result would have been the same. Suppose, for instance, the plaintiff had sued the railroad company alone; the cause of action being based solely upon the willful act of Dorsey, and had recovered a verdict of $1,500.00 punitive damages against the railroad company, of course, alone, unquestionably under the *Jones* and *Sparks cases, supra,* the railroad company upon payment of the judgment, would have been entitled to full reimbursement from Dorsey for the amount so paid; Dorsey, the "impecunious individual" would come under the obligation of reimbursement, besides being subject to criminal prosecution if the circumstances justified it.

Again referring to the statement above quoted:

"Certainly, in instances where the law of the land has been *purposely evaded or positively infringed by an artificial person,*" whose "invisible person cannot be physically touched, such artificial creation should be required. in the only way in which the law is able to reach it, to be made to suffer punishment sufficient to meet the offense." (Italics added.)

To this statement, as a general proposition, there is no objection; but what application has it to the facts of the present case? The plaintiff makes no contention, in pleading or argument, that the railroad company, as a separate

entity from Dorsey, its agent, has "purposely invaded or positively infringed" the law of the land; and there is no evidence in the case that has even the color of such a suggestion. The whole case is based upon the willful act of the agent, for which the railroad company is responsible, without the slightest suggestion that it authorized, directed, participated in, or ratified such act.

"The reasons assigned by Judge Rice for his refusal to set aside the verdict for punitive damages are, really, entirely sufficient to support his order."

His only reason is that punitive damages are given as a punishment and may be imposed according to the ability of the parties to pay; a proposition that no one will deny, but which does not come within drumbeat of the question involved in the appeal.

As I understand the position taken by the learned Justice, it is that, while the judgment entered upon the verdict in this case is conclusive upon both parties as to certain matters, it is not conclusive upon the right of the railroad company to reimbursement from Dorsey for the amount it has been adjudged liable and may pay. His position is indicated in the following extract from his opinion:

"Under the foregoing authorities, the matters included in the adjudication, and therefore the particulars in which the judgment may be regarded as conclusive, are: (1) The liability of the corporation master to respond in damages for the injuries complained of in the action, as resulting from the act of the agent within the scope of his employment; (2) the negligent and willful tort of the agent in consequence of which the present judgment was procured; (3) the amount of damages caused by the tort of the servant, for the payment of which the master could be justly held responsible by the injured person.

"In other matters, the present judgment could not be regarded as conclusive in an action for indemnity subsequently brought by one defendant against another.   *   *   *   The

defendants upon whom the verdict imposes liability are left free to take subsequent action, without their rights or remedies being curtailed."

In other words, that the judgments entered upon the verdict (as reduced in consequence of the order of his Honor, Judge Rice), leave open the question of the railroad company's right, upon payment of the judgment against it, to reimbursement from the defendant, Dorsey, therefor.

I do not think that this is the law; on the contrary, I think that from the facts which are conceded by the foregoing extract to be concluded by the judgment, it follows irresistibly that the master's right of reimbursement (or indemnity, if that term be preferred) has been established by the judgment and is, therefore *res adjudicata.* If it be conceded that the judgment establishes the fact that the servant alone has committed a willful tort, within the scope of his employment, for the consequences of which the master is legally responsible, it follows inevitably that the master's right of reimbursement upon payment of the judgment against him has been established.

Mr. Justice Blease criticises as *obiter* the additional reason assigned by the Court in the *Jones* and *Sparks cases,* in holding that a verdict exonerating the servant and holding the master liable in an action based solely upon the tort of the servant, is illogical, which reason is that it will destroy the master's right of reimbursement. I do not understand that he questions the right of the master under such circumstances to reimbursement, for he cites Cooley on Torts (2d) Ed.), 167, 168; 7 Labatt on M. & S. (2d Ed.), 8011; 2 Sherman & R. on Negligence (6th Ed.), 705; Freeman's notes to 16 Am. St. Rep., 255; *Oceanic Co. v. Compania,* 134 N. Y., 461; 31 N. E., 987; 30 Am. St. Rep., 685, and other authorities sustaining the unquestioned right of the master to reimbursement. (Note. The use of the word "reimbursement" in the *Jenkins case* is subjected to a covert criticism, *as appearing first in that case.* The word usually

employed is "indemnity."  It seemed to the writer 'that "indemnity" expressed the idea of *anticipating* payment, while "reimbursement" the idea of *accomplished* payment, and was the better term.)

If then the judgment concludes:  (1) The liability of the railroad company to respond in damages for the injury complained of, *as resulting from the act of the agent within the scope of his employment;* (2) the negligent and willful tort *of the agent,* in consequence of which he present judgment was procured; (3) the amount of damages *caused by the tort of the servant,* for the payment of which the master could be justly held responsible by the injured person; and as an inevitable corollary I think; (4) the right of the master to be reimbursed upon payment of the judgment against him—it would seem to follow that this right of reimbursement must stand in its integrity, and cannot be impaired by the judgment against the servant in a smaller amount.

I do not think that there can be a doubt as to the proposition advanced by Mr. Justice Blease, certainly not in cases where the person responsible over is not a party to the action, but is simply notified of its pendency and character, that the judgment against the immediate defendant does not determine the question whether the person claimed to be responsible over is in fact the person primarily responsible, or preclude him from setting up any defenses which from the nature of the action or pleadings he could not have interposed in the first action, had he been a formal party to it. This is exactly what was decided in the case of *Newell v. Blankenship,* 130 S. C., 131; 125 S. E., 420, in which the opinion was written by myself, and which I have seen no reason to change.

But, where the action is based upon the sole tort of the agent or servant, and, as Mr. Justice Blease concedes, the judgment is conclusive as to this fact, the conclusion of law from such fact is inevitable, that the right of reimbursement has been adjudicated.

The case of *Washington Bridge Co. v. Pennsylvania Steel Co.* (C. C. A.), 215 F., 32, opinion by Judge Woods, so strongly relied upon by Mr. Justice Blease, directly sustains the position for which I contend. In that case the bridge company entered into a contract for the construction of a steel bridge over the Potomac River. It contracted with the steel company to furnish and put in position the steel girder spans. During construction, a pier supporting the steel work gave way, seriously injuring an employee named Benning. He brought an action against the steel company, alleging negligence in not providing him with a reasonably safe place for work. The steel company immediately notified the bridge company of the pendency of the suit and of its intention to hold the bridge company responsible for any recovery in favor of Benning claiming that it had an indemnity contract from the bridge company covering all accidents whether due to its negligence or otherwise; no mention of this indemnity contract was made in the trial between Benning and the steel company, as it manifestly was irrelevant to the issue involved. Benning recovered a judgment against the steel company for $13,500.00. The steel company paid the judgment and brought suit against the bridge company, claiming under its indemnity and that the cause of the collapse was the negligence of the bridge company in not properly inspecting the concrete piers which had been constructed by a contractor of the bridge company, independent of the steel company, under the supervision of an engineer of the bridge company. The point in the case, relevant to the issue involved in the case at bar, was whether the judgment of Benning against the steel company was conclusive of the liability of the bridge company to the steel company under the notice which the steel company gave to the bridge company that it would be held responsible for any recovery in favor of Benning in his suit against the steel company. The Court very properly held, as quoted by Mr. Justice Blease, that it was "not con-

clusive as to matters not necessary for Benning to prove as a condition of his recovery against the steel company," but added the very significant statement:

"The rule, however, extends the conclusiveness of such a judgment to this point: If the record in the *Benning case* had shown that the negligence of the steel company in failing to perform its nondelegable duty of using due care to provide a reasonably safe place for Benning to work was necessarily *due solely to negligence of the bridge company* in not exercising due care to furnish a pier strong enough to bear the superstructure, and could not have been due to any independent breach of duty on the part of the steel company, *then the judgment in the Benning case would be conclusive of the actionable negligence of the bridge company and of its liability to the steel company.*"

It will be observed that in the *Benning case* against the steel company, there was no reference to the negligence of the bridge company which the steel company sought to make the party responsible over; that issue did not arise except upon the second trial of the suit of the *Washington & Berkeley Bridge Company v. Pennsylvania Steel Company,* reported in (C. C. A.), 226 F., 169. In the case at bar it was conceded that the tort complained of was committed by the agent or servant of the railroad company alone, and that is stated by Mr. Justice Blease as one of the matters concluded by the judgment. Hence, under the authority cited, the judgment is conclusive of the actionable negligence of Dorsey and of his liability to the railroad company. Bear in mind too that in the *Benning case* the bridge company was not a party defendant; while in the case at bar Dorsey was. *A fortiori* should the principle announced in the case cited be applied here. Besides in the case at bar, there being no evidence whatever of participation by the railroad company in the tort, it was a part of the plaintiff's case to establish the fact that the tort was committed by an agent

of the company, which, being established, established also the right of the railroad company to reimbursement.

In the case of *Washington Gas. Co. v. District of Columbia,* 161 U. S., 316; 16 S. Ct., 564; 40 L. Ed., 712, cited by Judge Woods in the case just discussed, a Mrs. Parker sued the District of Columbia to recover damages for an injury to her person alleged to have been suffered from stepping into a hole in the sidewalk of one of the streets of the City of Washington. The gas company was not made a party to the suit, but was formally notified of the pendency and character of the suit and that it would be expected to indemnify the District for any amount which it might be compelled to pay to Mrs. Parker. Mrs. Parker recovered a judgment of $5,000.00 which was paid by the District, and suit was brought by the District against the gas company as the party ultimately liable upon the ground that it was responsible for the unprotected condition of the box. The point was there made, as here, that the judgment in the Parker suit was not conclusive upon the gas company. The Court, however, concluded that upon a justifiable examination of the entire record in the *Parker case* it appeared that the gas company was primarily liable, and sustained the contention of the District as to the conclusiveness of the first judgment. "It follows, therefore, that the judgment against the District conclusively established a fact from which, as the duty to repair rested on the gas company, its negligence results." Differentiating that case from the *Robbins case,* 4 Wall, 657; 18 L. Ed., 427, the Court said:

"But in that case the liability of the city rested on actual notice of the defect in the street and not on implied negligence based on the continued existence of the defect which caused the injury; therefore, the essential fact on which the judgment against the city rested did not as a legal consequence imply negligence on the part of Robbins."

In the case at bar this must be conceded: The essential fact on which the judgment against the railroad company

rested *did* as a legal consequence adjudicate negligence on the part of Dorsey.

It is further stated in the opinion of Mr. Justice Blease:

"The proof connected the defendant, Dorsey's, act with the injury. It was not necessary for plaintiff to go beyond this, or to show that the corporation authorized or otherwise actively participated in the tort. The test of liability against the railroad was whether Dorsey was acting within the scope of his employment. Whether he was acting under instructions, or whether he was disobeying instructions, would not have been a defense either for himself or for the company."

All of which may be entirely true, without affecting the conclusion that, as the complaint counted upon the sole tort of Dorsey and the consequent liability of the railroad company, and the proof showed that, if there was a tort, it was solely that of Dorsey, the judgment is conclusive of the fact, and from it the right of the railroad company to reimbursement is complete.

I had supposed that nothing more than a citation of the cases of *Jones v. Railroad Co.,* 106 S. C., 20; 90 S. E., 183. *Sparks v. Railroad Co.,* 109 S. C., 145; 95 S. E., 344. *Ilderton v. Railroad Co.,* 113 S. C., 91; 101 S. E., 282, and *Beauchamp v. Winnsboro Granite Corporation,* 113 S. C., 522; 101 S. E., 856, was necessary to re-enforce the declaration made in the *Jenkins case,* specifically sustained by those cases so recently decided, that a judgment in an action against the master and the servant, based upon the tort of the servant alone, was conclusive upon both; that, if it be against the master and in favor of the servant, it cannot stand; that at least one ground upon which the conclusion was arrived at was that the master's right of reimbursement would be destroyed. I could not in the *Jenkins case* and cannot now see any difference, except in degree, between the effect of a judgment in favor of the servant and one against him for a great deal smaller amount than against the master.

Both affect the substantial legal right of the master to be re-imbursed by the offending servant, in the one case a total destruction and in the other partial.

But it appears necessary, in order to sustain the position of Mr. Justice Blease in this case, that one of the grounds upon which those cases were decided shall be eliminated, upon the ground that it was not necessary to a determination of the cases, and, therefore, *obiter dictum.* Reviewing briefly the *Jones* and *Sparks cases:* The decision of the Court in the *Jones case* was predicated solely upon the act of the servant, and that, if he was found not liable, "it would be unreasonable to say that the servant did no wrong, but nevertheless his master is liable, when the only wrong charged against the master is that of the servant"; (2) that, where the company's liability is predicated solely upon the conduct of its servant under the doctrine of *respondeat superior,* the servant whose wrongful act actually caused the injury is liable over to the company for the amount, it will be compelled to pay on account thereof. "But as the verdict acquits the servants of having done any wrong (there were two servants involved in the case), the company is deprived of its remedy against the offending servant or servants, because the judgment in this case would be a bar to an action by the company against either or both of them."

In the *Sparks case,* the first ground stated above in reference to the *Jones case,* was thus stated:

"In fact, it had been finally adjudicated that Jones [the servant] had done no wrong. It necessarily follows that the company had done no wrong through the agency of Jones."

In reference to the second ground, it was declared:

"Moreover, if Jones' wrongful acts had caused the injury, and the company had been made to pay damages therefor under the doctrine of *respondeat superior,* the company would have had a right of action over against him, or, being a party to the action with the company, it would have had

the right to compel him to pay the judgment. But it is perfectly clear that the company will be deprived of that right if it can now be held liable for the acts of Jones after he had been discharged from liability in the same action with the company for the same wrong, for the judgment in his favor would bar an action of the company against him, or any attempt on the part of the company to compel him to pay the judgment obtained against it. As between him and the plaintiff and as between him and the company, it is *res adjudicata* that he has done no actionable wrong. The recent case of *Jones v. Railway,* 106 S. C., 20; 90 S. E., 183, is directly in point, and it is conclusive against the contentions of appellant."

It is this second ground that the learned Justice would eliminate from the cases as not being necessary to their determination and, therefore, *obiter dictum.* I think that the authorities are overwhelmingly against this contention.

"I do not understand that, if a Judge rest his decision upon two different grounds either of which is sufficient to support the decision, either of the grounds taken can be said to be but an expression of opinion which was unnecessary for the determination of the case and, hence, a *dictum* or *obiter dictum;* that is, a *dictum* entered in passing or merely incidental and unnecessary." *Landreville v. Gouin,* 6 Ont., 455.

In *Kane v. McCown,* 55 Mo., 181, it was said that in a certain case a question was presented and discussed "and the opinion of the Court, or a majority of the Court, was expressed on it. The question was, in that case, presented by the instructions, and, though its decision might have been avoided, the opinion was not, therefore, an *obiter dictum.*"

That a decision might have been put upon a different ground, does not place it in the category of a *dictum.* *Clark v. Thomas,* 4 Heisk (Tenn.), 419.

And, where the record presents two or more points, on either of which the decision might turn, and both are fully

considered and determined, neither can be considered as a *dictum. State v. Brookhart,* 113 Iowa, 250; 84 N. W., 1064. *Brown v. R. Co.,* 102 Wis., 137; 77 N. W., 748; 78 N. W., 771; 44 L. R. A., 579. *Hawes v. Water Co.,* Fed. Cas. No. 6235, affirmed in 104 U. S., 450; 26 L. Ed, 827.

In *Florida C. R. Co. v. Schutte,* 103 U. S., 118; 26 L. Ed., 327, the Court said:

"It cannot be said that a case is not authority on one point because, although that point was properly presented and decided in the regular course of the consideration of the cause, something else was found in the end which disposed of the whole matter. Here the precise question was properly presented, fully argued, and elaborately considered in the opinion. The decision on this question was as much a part of the judgment of the Court as was that on any other of the several matters on which the case as a whole depended."

In *Union P. Co. v. Mason Co.,* 199 U. S., 160; 26 S. Ct., 19; 50 L. Ed., 134, the Court said:

"Of course, where there are two grounds, upon either of which the judgment of the trial Court can be rested, and the Appellate Court sustains both, the ruling on neither is *obiter.* * * * Whenever a question fairly arises in the course of a trial, and there is a distinct decision of that question, the ruling of the Court in respect thereto can, in no just sense, be called mere *dictum."*

In *Ontario Land Co. v. Wilfong,* 223 U. S., 543; 32 S. Ct., 328; 56 L. Ed., 544, quoting syllabus, it was held:

"Where a decision is based on two grounds either of which is sufficient to sustain it, neither is *obiter."*

In *Chicago, B. & Q. R. Co. v. Board* (C. C. A.), 182 F., 291; 31 L. R. A. (N. S.), 1117, the Court said:

"It is not the practice of Courts to rest their decisions upon a single ground, or upon the narrowest possible basis of fact. On the contrary, every consideration which is directly controlling of the actual issue tendered is a legitimate *ratio decidendi* * * * [referring to the case above cited

from 199 U. S.].    *   *   *    It was earnestly urged by distinguished counsel that all that was said in this second part of the opinion was *obiter;* but the Supreme Court and this Court held that it had the same binding force as that which was said in support of the first ground of the decision."

In 15 C. J., 953, it is said:

"So also where a case presents two or more points, any one of which is sufficient to determine the ultimate issue, but the Court actually decides all such points, the case is an authoritative precedent as to every point decided, and none of such points can be regarded as having merely the status of a *dictum*"—citing many cases.

"Where an Appellate Court places its decision on two or more distinct grounds, each is as much an authoritative determination as the other, and neither can be disregarded as *obiter dictum." King v. Pauly,* 159 Cal., 549; 115 P., 210; Ann. Cas. 1912-C, 1244.

"Where a decision is based on two independent lines of reasoning, neither one is a *dictum,* but one is as necessary to the decision as the other." *Pugh v. Moxley,* 164 Cal., 374; 128 P., 1037.

In *Williams v. Arlington Hotel Co.* (D. C.), 15 F. (2d), 412, the Court said:

"All these questions having been fully discussed, and, by the Court, in a carefully prepared opinion, determined, they cannot be treated as *obiter.* The well-settled law is: 'Where there are two grounds, upon either of which the' Appellate Court may rest its decision, and it adopts more than one, 'the ruling on neither is *obiter,* but each is the judgment of the Court and of equal validity with the other.' "

In *U. S. v. Title Co.,* 265 U. S., 472; 44 S. Ct., 621; 68 L. Ed., 1110, decided June 9, 1924, it is said:

"Where there are two grounds, upon either of which an Appellate Court may rest its decision, and it adopts both,

'the ruling on neither is *obiter,* but each is the judgment of the Court and of equal validity with the other.' "

But it is insisted, in the *Jones* and *Sparks cases* the servant was acquitted of all wrong, while in the case at bar the servant was convicted and a verdict carrying both actual and punitive damages was awarded against him. If, as held in those cases, the judgment as to the servant was *res adjudicata* as between him and the master, it must have been so in all respects, and the difference between a verdict finding no damages and one finding a limited amount is only a difference in degree; the element of conclusiveness is alike in both. The fact then that under this judgment Dorsey is liable for only $300.00 punitive damages is necessarily a limitation upon the railroad company's right of reimbursement against him upon the payment by it of the judgment of $1,500.00 against it.

It is said in the opinion of Mr. Justice Blease:

"Again in the Federal Courts, it has been held, or certainly indicated, that it would be held that, when two or more persons are sued in the same action for the same tort, evidence as to the wealth of but one of the defendants is not admissible; while in this State such testimony is admitted to be competent."

I concede that this is true under the South Carolina decisions in a case where the defendants are sued as *active participants* in a *willful tort,* all responsive directly in punitive damages. I do not concede that it is applicable to a case sounding in compensatory damages only or to a case sounding in punitive damages based upon the willful tort of the servant alone.

The point of my distinction appears to have been entirely missed by the learned justice. I do not contend that in an action against both master and servant based upon a tort, whether negligent simply or willful, participated in by both, an apportionment of damages cannot be had. I yield to the authorities in this State upon that point, as I

specifically did in the *Jenkins case.* And under such cir-
cumstances, where the action is based upon the combined
willfulness of both, there can be no sound reason why the
wealth of one of the defendants, or of each for that matter,
is not a legitimate matter of inquiry upon the question of
punitive damages, as a just means or basis of the punish-
ment to be inflicted. What I do insist upon is that, where
the action is against both, and it is based upon the sole neg-
ligence or willfulness of the agent or servant, the effect
of apportioning damages necessarily and inevitably destroys
the right of the principal or master to reimbursement.

The case of *Rowe v. Moses,* 9 Rich. Law, 423; 67 Am.
Dec., 560, is of no significance in the present issue, for that
was a case in which the plaintiff sued the defendant alone
for damages on account of an assault and battery commit-
ted by the defendant alone upon the plaintiff. It was a
claim for punitive damages and it was specifically stated
that in such an action evidence of the wealth of the defend-
ant was clearly admissible, as to which ruling I have abso-
lutely no criticism; it is acknowledged everywhere.

So in *Burckhalter v. Coward,* 16 S. C., 439, which was
an action of slander by the plaintiff against the defendant
alone, involving of course the element of punitive damages.
The Court very properly held that the jury, in fixing the
amount of their verdict, might consider the pecuniary con-
dition of the defendant; as to which there is and can be no
controversy.

The case of *Elms v. Power Co., 79* S. C., 503; 60 S. E.,
1110, was a suit against the master and servant for a *joint
willful tort,* in which the Court held that evidence of the
wealth of the corporation defendant was admissible; a
proposition with which I have no controversy, but which is
very far from holding that, in an action based solely upon
the willful tort of the servant, the damages for which, ac-
tual and punitive, the master upon payment may recoup
from the servant, such evidence is admissible.

So in *Calder v. R. Co.,* 89 S. C., 287; 71 S. E., 841; Ann. Cas. 1913-A, 894, the suit was against the Pullman Company and the railroad company for damages resulting from an assault by a stranger upon a passenger while in her berth. A nonsuit was ordered as to the railroad company, and the case proceeded against the Pullman Company alone. Upon the issue of punitive damages, the Court held that evidence as to the wealth of the Pullman Company was admissible; as to which ruling no one could rightly complain. That case, too, does not touch the point at issue.

This misconception of my position is clearly demonstrated by the following extract from the opinion:

"Either it must be placed within the province of the jury to find separate verdicts, or the rule permitting the consideration of evidence of the wealth of the defendants must go out of the issue of punitive damages. There is no middle ground between these two propositions."

There *is* a plain and just middle ground: If the action is against the master alone, based upon the willful tort of the servant alone, evidence of the master's pecuniary condition is admissible; if it is against the master and servant jointly, based upon the combined willful tort of both, the damages are apportionable and the evidence is admissible; if it is against the master and servant jointly, based upon the sole willful tort of the servant, the damages are not apportionable, the right of reimbursement cannot be disturbed, and the evidence is inadmissible.

It is very true, as stated by Mr. Justice Blease, that the Federal Supreme Court and this Court are at variance upon several phases of the law of damages, compensatory and punitive. The main differences are, as held by the Federal Court: (1) That the master should not be held liable in punitive damages for the willful tort of his servant, in the absence of evidence of authorization, participation, or ratification; (2) that, in an action based upon the *joint tort* of the master and servant against both, there can be no appor-

tionment of damages either compensatory or punitive; (3) that in an action based upon the *joint willful tort* of the master and servant against both, evidence of the wealth of either party is inadmissible.

I can readily understand how the third proposition is a necessary corrollary from the second, but I cannot see how either proposition has the slightest bearing upon the question at issue in the case at bar; whether, in an action against both master and servant, based upon either the negligent or willful tort *of the servant alone,* the damages, either compensatory or punitive, can be apportioned.

I agree with the learned Justice when he says, speaking of punitive damages:

"One of the chief purposes in awarding damages in this class is *to punish the wrongdoer,* not only to prevent by him a recurrence of the wrongful act, but to deter others from conduct of the same or similar kind.   *   *   *   The object is to protect every man, woman, and child *from those who consciously disregard the rights of their fellows.*"

This argument would logically and inevitably lead to the adoption of the Federal rule above stated in reference to the liability of a master in punitive damages for the willful tort of his servant—*to punish the wrongdoer.* Who is the wrongdoer? The master? Certainly not, for it is assumed that the servant is the sole tort-feasor; the master being held liable not because he committed the tort, for it is conceded that he did not, but because of his relation to the servant. *To prevent a recurrence by him of the wrongful act;* prevent the master from a recurrence of a wrongful act which he did not commit? That will not do; there can be a recurrence only of an act which has before been committed. *To protect from those who consciously disregard the rights of others?* If the servant alone has committed the willful tort, how could the master have been guilty of a conscious wrong? That is to say, the master must be punished as a wrongdoer for a wrong which he has not committed, to prevent him

from the recurrence of an act which, as to him, has no antecedent, because he consciously committed the act of which another was the sole author, and which he may positively have forbidden the other to commit. This is aside, of course, from the liability of the master in *compensatory damages* for the willful tort of his servant, committed within the scope of his employment, which is universally conceded.

It is of little moment to inveigh against the principle established by this Court that the master is liable in punitive damages for the consequences of the willful tort of his servant in which he has not participated, but I cannot refrain from calling attention to the incongruity which has resulted from the rule: Under the circumstances stated, the master has recourse over against the servant for reimbursement; in the trial, the plaintiff has introduced evidence of the wealth of the master; the punitive damages are raised thereby; the servant then has to respond to the punitive damages recovered against the master based upon the pecuniary condition *of the master.* A rule which leads to such a result cannot be a just one. As is said in the *Ilderton case:*

"It has been suggested that it is not probable that defendant will sue O'Quinn [the servant] on his liability over, if the judgment be affirmed. Courts decide cases according to the legal rights of the parties, and not according to the probability or improbability of their exercising such rights."

I deferentially suggest that Mr. Justice Blease, who has written the leading opinion in this case, and Mr. Justice Watts, the author of the "clear and vigorous, in brief, dissent" in the *Jenkins case,* appear less willing to follow the case of *White v. McNeily* than I am. In the opinion of Mr. Justice Blease, concurred in by Mr. Justice Watts, it is held that, while the rule of nonapportionment of damages announced in the *Jenkins case* "should continue to be enforced as to *compensatory* damages, it should be modified so as not to apply to punitive damages."

In the *White v. McNeily case,* as reported, I find nothing to indicate that the action was for punitive damages. The defendants were sued in trespass, and the evidence showed that they had plundered the plaintiff's house of furniture, and had taken away several of his horses and burnt his dwelling; the total sums awarded amounted to 700 pounds for the destruction of property *which the plaintiff valued at 1,000 pounds;* which excludes the idea that the verdict was for punitive damages; *yet in that case apportionment was allowed.*

In *Bevin v. Linguard,* 1 Brev., 503; 2 Am.Dec., 684, the action was also in trespass for damages on account of an outrageous assault and battery. The plaintiff was assaulted in his dwelling house, a part of which was torn down and his goods thrown about. The verdict was for $500.00 against both defendants, to be paid so much by one defendant and so much by another. The Court held that the trespass was exceedingly outrageous and the damages were not thought immoderate. No suggestion appears in the case that any part of the verdict was for punitive damages, and, comparing its size with the character and circumstances of the assault, that feature manifestly did not enter into the case. *The apportionment was allowed.*

In *Boon v. Horn,* 3 Strob., 159, the action was in trespass *q. c. f.* against eight defendants. The verdict was apportioned $5.00 to each. It appears to have been conceded that the verdict was in permissible form under "the liberty given by our peculiar practice," as Judge Wardlaw terms it. No question of actual or punitive damages was raised, and no differentiation on that line of cleavage was suggested.

In *Smith v. Singleton,* 2 McMul., 184; 39 Am. Dec., 122, the action was in trespass for assault and battery. The doctrine declared in *White v. McNeily* was again approved. No allusion is made to punitive damages.

In *Rhame v. Sumter,* 113 S. C., 151; 101 S. E., 832, the city and a plumber were sued jointly for damages resulting

from an automobile running into an open ditch in the street, left in that condition by the plumber. The jury found a verdict for $425.00 *actual damages* (so stated in the verdict) against the city and a like amount, similarly characterized, against the plumber. The Court, *Mr. Justice Watts* delivering the opinon, held:

"The verdict of the jury found against each defendant $425.00. *This they had the right to. do.*" (Italics added).

No issue of punitive damages entered into the case.

So far, then, as the "clear and vigorous, in brief, dissent" of Mr. Justice Watts in the *Jenkins case,* commended by Mr. Justice Blease, is concerned, it is apparent that "the rule laid down in Justice Cothran's opinion," is not only not "contrary" to the decisions of this State, but is in conformity with them; and that the contrariness (in a grammatical sense only) is presented in the opinion of Mr. Justice Blease, in which Mr. Justice Watts, who wrote the opinion in the *Rhame case, directly to the contrary,* has concurred.

The effect of the opinion of Mr. Justice Blease, if it should prevail as the judgment of this Court, will be: (1) That in cases of joint negligence on the part of both master and servant, resulting in actual damages only, there can be no apportionment of the verdict; but (2) in cases of joint willfulness on the part of both master and servant, as well as (3) in cases of sole willfulness on the part of the servant, imputed to the master, there may be apportionment of damages.

I deferentially submit that the first proposition is directly in conflict with the case of *White v. McNeily* and cases cited which have reluctantly followed it, all of which were cases of actual or compensatory damages and *all of which approved of apportionment.* The second proposition is implicitly sustained by the same cases. The anomaly is presented of overruling these cases in sustaining the first

proposition, and relying upon them in sustaining the second and third.

Mr. Justice Blease gives three reasons why the *Jenkins case* was wrongly decided:

(1) "Because so many of the Judges of this Court expressed themselves favorably to our view prior to the Jenkins decision." Not a single decision has been cited, *or can be found,* sustaining this declaration. The *Jenkins case* was the first case in which the matter under discussion was suggested.

(2) Because "the views of the present Chief Justice (Gary), as expressed by him in many of his opinions, and in many opinions of other Judges with whom he concurred, give us assurance that he, had he participated in the *Jenkins case* the majority opinion there would have been the minority opinion of the Court." As I have endeavored to show, the point has never before been presented to the Court; no opinion of the learned Chief Justice or of any of the great Judges who have adorned this Court has been or can be cited to sustain this declaration. It is to me a novel argument, that the conjectural opinion of a justice who did not participate in the decision of the *Jenkins case,* and has never judicially expressed himself upon the matter at issue, should be appealed to as sustaining one side or the other of such issue.

(3) "Because of the clear and vigorous, in brief, dissent of Mr. Justice Watts, concurred in by the late lamented Mr. Justice Fraser in the *Jenkins case,* which was as follows: 'I dissent from Justice Cothran's opinion as to exception 3; under the authorities quoted by Mr. Justice Cothran, *the law of this state has been contrary to the rule laid down in Justice Cothran's opinion,* and I do not care what the law is in other tribunals; I feel bound to adhere to the law laid down by the decision of this State. The law has been laid

down and followed by bench and bar for years, and I see no reason to depart from the decisions.'

"Mr. Justice Cothran" certainly labored in vain, if his opinion in the *Jenkins case,* be even plausibly amenable to the charge that it was an effort to state a rule contrary to the former decisions of the Court; "to depart from the decisions" laid down and followed by bench and bar. Every South Carolina decision which could be found was cited, explained, and quoted from, and the conclusion was thus stated: "However much the departure from the rule of the common law may be regretted, it has been too firmly adhered to to be now abandoned"; and in this implied regret "Mr. Justice Cothran" would not be ashamed to be associated with the Supreme Court of the United States and with the great Judge O'Neall, who in *Smith v. Singleton,* 2 McMul., 184; 39 Am. Dec., 122, said:

"The case of *White v. McNeily,* in 1784, ruled, that the jury in such a case might sever and apportion the damages according to the degree and nature of the offense committed by each defendant. *The wisdom of such departure is, I think, very questionable; but it has been in practice ever since conformed to.*"

My effort in the *Jenkins case,* abortive as it appears to have been to the learned dissenting justices and to the writer of the leading opinion in the appeal under consideration, was to show that, in every South Carolina case which could be found upon the subject, the defendants, among whom it was held permissible to apportion the damages, *were direct, active, personal participants in the tort complained of;* that the jury under such circumstances might apportion the damages according to the different degrees of the guilt of the trespassers, according to the degree and nature of the offense committed by *each defendant"* (*Smith v. Singleton,* 2 Mc-Mul., 184; 39 Am. Dec., 122), "agreeable to the degree of guilt of *each trespasser* (*White v. McNeily,* 1 Bay, 11) ; not

one of them was a case where the only participant was the servant, and liability was imputed to the master by reason of the relation between them.

It was upon this ground, conceding the binding authority of the decisions which had been announced (*White v. Mc-Neily,* 1 Bay, 11; *Whitaker v. English,* 1 Bay, 15; *Bevin v. Linguard,* 1 Brev., 503; 2 Am. Dec., 684; *Smith v. Singleton,* 2 McMul., 184; 39 Am. Dec., 122; *Rhame v. Sumter,* 113 S. C., 151; 101 S. E., 832 [not one of which decided the question raised in the *Jenkins case*]), that it was said:

"In view, however, of the almost solitary position of this Court upon the question, opposed as it is by the authority of the supreme tribunal of the nation, and by almost every other State Court (and criticised as it has been by the Judges who felt imposed [impelled?] to follow it), the rule should be confined to the precise condition which gave it birth."

The "question" referred to was manifestly the rule announced in *White v. McNeily,* that in cases of actual, not constructive, joint wrongdoers, the jury might apportion the damages. The "condition which gave it birth" was the tort, the basis of the case of *White v. McNeily,* a description of which I reproduce from the *Jenkins case.*

"McNeily, a tory, who had joined the British Army in 1780, with a party of marauders, plundered the house of White, burnt it, and carried away his horses. He and two others of the party were afterwards sued by White for the trespass [after the war]. The jury rendered a verdict of 400 pounds against McNeily, 200 against one of the other defendants, and 100 against the third."

These were the circumstances which gave birth to the rule. The three defendants were direct, active, personal participants in the outrage; the defendant McNeily, who raised the question of apportionment, was held "an aider and abetter in the enterprise," the largest verdict having been given against him doubtless by reason of his leadership.

The decision in the cases of *Currier v. Swan,* 63 Me., 323, *Lake Erie R. Co. v. Halleck,* 78 Ind. App., 495; 136 N. E., 39, and *Hallv. McClure,* 112 Kan., 752; 212 P., 875; 30 A. L. R., 782, cited by Mr. Justice·Blease as holding that an attempted apportionment of damages should be stricken out as surplusage and a joint judgment entered against all of the defendants for the full amount assessed against both defendants, were specifically based upon the want of power on the part of the jury to apportion the damages in cases of joint tort. I cannot see therefore how much comfort can be gathered from them.

I think, therefore, that the judgment of the Circuit Court should be reversed as to the judgment upon the verdict for punitive damages, and affirmed as to the judgment of $200 upon the verdict as reduced, for actual damages, jointly against both defendants.

MR. ACTING ASSOCIATE JUSTICE PURDY concurs.